Larry J. WILSON, Plaintiff-Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellee.

No. 83–3454
Non-Argument Calendar.

United States Court of Appeals, Eleventh Circuit.

May 29, 1984.

---

Robert P. Byelick, St. Petersburg, Fla., for plaintiff-appellant.

Virginia Covington, Asst. U.S. Atty., Tampa, Fla., Elyse Sharfman, Dept. of HHS, Atlanta, Ga., for defendant-appellee.

Before GODBOLD, Chief Judge, RONEY and TJOFLAT, Circuit Judges.

PER CURIAM:

In this appeal we review the denial of disability insurance benefits to a 38 year-old claimant who suffers from pain and stiffness in numerous joints, including his hands, back, knees, and ankles. Because the ALJ improperly engaged in "sit and squirm" jurisprudence as well as applied an improper standard, we vacate and remand for further proceedings consistent with this opinion.

At some time in the mid-1970's Wilson began to experience pain and stiffness in his joints. The earliest medical report in the record comes from Dr. Soshea who saw Wilson from June 1976 to February 1977. The doctor determined that Wilson's examination was essentially normal but diagnosed "secondary fibrositis." 2 Rec. at

151–52. Dr. Soshea prescribed a program of extra rest and medication. *Id.* Various combinations of medications were tried but none with great success. *Id.*

Because Wilson was not improving, he was unable to perform his usual job as a mechanic for Florida Power. The company sent him to a rheumatologist, Dr. Espinoza, for evaluation. Dr. Espinoza found the "[p]hysical examination except for obesity and obvious stiffness around the shoulder girdle was unremarkable." *Id.* at 153. He diagnosed "Fibrositis, an ill-defined entity with a poor prognosis from a rehabilitation point of view." *Id.* The doctor prescribed an anti-inflammatory medication.

Florida Power created a new position for Wilson as storekeeper in the parts department. He continued to have physical problems, however. On July 10, 1980, Wilson tripped and fell while at work. He was taken to an emergency room, where he was referred to Dr. Hobby, an orthopedic surgeon. Hobby diagnosed a lumbar sprain. *Id.* at 123. At this point Hobby became Wilson's treating physician.

Wilson continued to experience pain in his back, shoulders, and knees, although his neck pain was alleviated to a great extent. *Id.* at 124. Because of the lack of general improvement, Dr. Hobby recommended a stay in the hospital for "intensive conservative treatment including bedrest, therapy, pelvic traction and possibly neurological consultation." *Id.* at 125. Wilson was hospitalized for two weeks. The traction was not helpful. *Id.* He had a bone scan that was negative and a cat scan that was negative for spinal stenosis. *Id.*

During this hospitalization, Dr. Bridgeford served as a consulting physician. He recommended a myelogram, but Wilson refused on the ground that, whatever the test showed, he would refuse surgery. *Id.* at 69–70. The doctor diagnosed possible midline lumbar disc, possible cervical strain, and cervical osteoarthritis. *Id.* at 136. He continued to advise evaluation for disc surgery in both the neck and back. *Id.* at 127.

Hobby released Wilson from the hospital "not improved" and with a recommendation for conservative treatment at home. *Id.* at 125. The doctor continued to see Wilson every few months, with essentially no improvement in his condition. *Id.* at 127–31. The last date of evaluation is June 11, 1981. On January 14, 1982 Hobby wrote a letter to Wilson's attorney stating:

> Mr. Wilson suffered an injury to his back on the 10th of July 1980. He has been totally disabled since that time. His disability is still complete and his disability will continue for an indefinite time.
>
> Any additional information that I can give would be a pleasure.

*Id.* at 163.

Dr. Ricca, a rheumatologist, examined Wilson in February 1981. He concluded that Wilson "had perhaps some degenerative arthritis and possibly a fibrositis syndrome, but most importantly I felt that he had sciatica and a probable herniated disc at the L–4, L–5 level." *Id.* at 145. Because Wilson refused to have a myelogram, Ricca did not "have much to offer him." *Id.*

Dr. Osher, an orthopedist, evaluated Wilson in September 1981 for SSA. The doctor determined that:

> [t]here is no evidence of focal neurological deficit, but he does have changes consistent with an arthritic process in his back. He may have congenital myotonia that is becoming manifest in his middle age. This would cause him the trouble moving and the limited motion and be unresponsive to all of the entire arthritic therapy that he has had. Such a diagnosis would have to be based on an electromyographic study to be certain.

*Id.* at 148.

At the request of Wilson's attorney, Dr. Osher saw Wilson again in October 1981. He suggested that a myelogram and an electromyogram might "find the root of the problem." *Id.* at 156. The doctor reported that Wilson must be suffering from "some sort of a myotonia which is an abnormality in the muscles; in which the muscles contract and have troubling [sic] relaxing and

releasing their tension." *Id.* He indicated that an electromyogram would show whether Wilson suffered from myotonia. *Id.* at 157. However, the record does not show that such a test was given.

When contacted by Wilson's attorney, Dr. Osher reported that:

I do think he was disabled as of my seeing him in the fall of 1981. I would expect that he would still be disabled unless there has been a change in his status. I would think his previous doctors would be better able to say exactly when he became disabled.

It is within the realm of reasonable medical probability that disability commenced with the injury at work in 1980.

*Id.* at 155.

The SSA also sent Wilson to a radiologist, Dr. Sherman. He found no abnormalities in his examination of the entire spine and both knees. *Id.* at 150.

Wilson applied for disability insurance benefits in March 1981. The SSA denied his application initially and on reconsideration, both times on the lack of severity of his condition. *Id.* at 104, 106.

Wilson then requested and received a hearing before an Administrative Law Judge. He testified generally as to his pain and limitation of his activities. His wife testified and basically corroborated her husband's statements. *Id.* at 40–80. Wilson was represented by an attorney at the hearing.

After the hearing, the ALJ determined that additional information was needed to evaluate the claim, and Wilson was sent to Dr. Leber, a neurologist, for an evaluation. Dr. Leber apparently did not have the reports of the other doctors, although he knew some of the information contained in them. *Id.* at 165. Dr. Leber concluded that there was:

no evidence of any neurological disease in this gentleman and [I] really suspect he does not have a neurological or an orthopedic problem. It seems that he has seen several physicians in the past concerning various aches and pains, but I don't really know if anything definitive has been found. I suspect not. I do not think this gentleman is disabled from any medical reason. I ... did not offer any medication to him at this time.

*Id.* at 166.

After receiving Dr. Leber's report, the ALJ contacted Wilson's attorney and gave him ten days to respond and/or submit additional evidence. No response was made. The ALJ denied benefits. He stated:

In view of the findings and conclusion of this physician [Dr. Leber] as well as the prior gross discrepancy between the claimant's subjective complaints and the objective findings upon multiple examinations, the undersigned is not convinced that the claimant's physical impairment and resulting discomfort have been so severe as to substantially interfere with his ability to engage in all forms of work activity for a continuous period of at least 12 months. Admittedly, the claimant may have had difficulty as a result of fibrositis primarily affecting the knees, a lumbar sprain sustained in a fall on July 10, 1980, and moderate degenerative osteoarthritis of the spine which has interfered with his ability to engage in strenuous forms of work activity involving significantly heavy lifting, carrying, pushing or pulling, climbing or crawling, or prolonged standing or walking. However, the preponderance of the evidence of record fails to demonstrate the existence of an impairment serious enough to further restrict the claimant's activity for any prolonged period which lasted or could be expected to last for at least 12 continuous months.

The Administrative Law Judge has not ignored the claimant's complaints of pain in making this decision and is aware that pain alone may warrant a finding of total disability where it is found to be so severe as to substantially interfere with the claimant's ability to perform work-related tasks. The Administrative Law Judge closely observed the claimant at the hearing and observed no physical

signs which would be related to constant and severe pain. Although the claimant did use a cane at the hearing and stood at times during the hearing, he answered questions alertly and his thoughts did not wander. No significant impairment of memory or concentration was noted. Further, there are insufficient clinical findings of record to substantiate the claimant's complaints of constant and severe pain. Although he has been prescribed and apparently takes, frequently, pain medications including Tylenol # 3 and Robaxin, the undersigned is not convinced, based upon the evidence of record, of a frequent need for such medication. While the claimant did indeed experience some chronic degree of pain associated with degenerative osteoarthritis and fibrositis, it has not been shown to be so serious as to interfere with his ability to engage in work activity at least within the restrictions noted above.

*Id.* at 22. Applying the grids, the ALJ determined that Wilson was not disabled.

Wilson sought review by the Appeals Council. He introduced two new pieces of evidence: a work evaluation report by Craver, an occupational therapist, and a deposition by Dr. Osher. The therapist concluded that:

[t]he patient seemed well motivated and appeared to try his hand at the tests. However, it does not appear that the patient is able to maintain gainful employment due to his pain syndrome and orthopedic limitations.

*Id.* at 172. Dr. Osher's deposition basically repeated his two prior medical reports. *Id.* at 174–92.

The Appeals Council considered this additional evidence. It determined that the therapist's report was "an assessment of your complaints and medical limitations, more than an assessment of your vocational qualifications for work." *Id.* at 4. It also decided that Osher's deposition was generally repetitious and/or cumulative of medical evidence already in the record. *Id.* at 4–5. The Appeals Council concluded that "the additional evidence [was] not per-

suasive," found the ALJ's decision "consistent with the weight of the more probative evidence," and declined to review the ALJ's determination. *Id.* at 5.

Wilson appealed to the district court. The magistrate recommended that the court find the Secretary's decision supported by substantial evidence. Following this recommendation, the district court affirmed the Secretary.

 The ALJ determines the disabling nature of pain. *Gaultney v. Weinberger,* 505 F.2d 943, 945–46 (5th Cir.1974). If substantial evidence supports the determination, this court will affirm. *Fortenberry v. Harris,* 612 F.2d 947, 950 (5th Cir.1980). In making such a determination, the ALJ must recognize that pain alone can be disabling even if there is no objective medical evidence to support the claimant's testimony about pain. *See Gaultney,* 505 F.2d at 945. At the same time, credibility determinations are for the ALJ. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1242 (11th Cir. 1983). Even so, this court has condemned "sit and squirm" jurisprudence.

[T]he ALJ engaged in what had been condemned as "sit and squirm" jurisprudence. In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant falls short of the index, the claim is denied. As the court observed in *Tyler* [*v. Weinberger,* 409 F.Supp. 776 (E.D.Va.1976)], this approach

will not only result in unreliable conclusions when observing claimants with honest intentions, but may encourage claimants to manufacture convincing observable manifestations of pain, or, worse yet, discourage them from exercising the right to appear before an Administrative Law Judge for fear that they may not appear to the unexpert eye to be as bad as they feel.

409 F.Supp. at 789.

*Freeman v. Schweiker,* 681 F.2d 727, 731 (11th Cir.1982).

■ The ALJ determined that claimant was not suffering pain of a disabling nature because Wilson did not appear to be in great pain at the hearing and no clinical findings supported Wilson's testimony. 2 Rec. at 22. The ALJ even concluded that Wilson did not need all the medication that had been prescribed to him. *Id.* The ALJ thus improperly engaged in "sit and squirm" jurisprudence and erroneously required objective medical evidence to support Wilson's testimony about pain. Because of these errors, the case must be remanded to the Secretary for further consideration under proper standards.

■ The record indicates that six out of eight doctors thought Wilson was suffering from some problem (Soshea, Espinoza, Hobby, Bridgeford, Ricca, and Osher) and only two (Leber and Sherman) concluded that he had no problem. Generally, a treating doctor's opinion is entitled to more weight than a consulting doctor's. *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir.1981) (Unit B). However, the ALJ may reject a treating doctor's opinion when it is contrary to the evidence, *id.*, and

> [a]n acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled. It must be supported by clinical or laboratory findings.

*Id.* (citations omitted).

■ In a sense, the statements to Wilson's attorney by Dr. Hobby and Dr. Osher are conclusory opinions. 2 Rec. at 155, 163. However, these opinions should not be considered in a vacuum, and instead the doctors' earlier reports should be considered as the bases for their statements to Wilson's attorney. In *Warncke v. Harris*, 619 F.2d 412 (5th Cir.1980), the court established the rule that a brief and conclusory statement made by the treating physician was not persuasive evidence of disability.

*Id.* at 417. However, the conclusory standard in *Warncke* conflicted with the doctor's earlier report in which he had stated that claimant could possibly work in light sedentary or messenger jobs. *Id.* at 414. Throughout his treatment of Wilson, Dr. Hobby stated that claimant was disabled or unable to work. 2 Rec. at 123–31. Dr. Osher did not state in his reports that Wilson was disabled, but he did believe Wilson had trouble moving and had limited motion. *Id.* at 147–48, 156–57. Given the doctors' prior reports, their statements to Wilson's attorney about Wilson's disabilities are not the kind of conclusory standard recognized as non-persuasive in *Warncke*.[1]

Reviewing the record as a whole and recognizing that the statements by Osher and Hobby have some persuasive value, we conclude that the ALJ improperly gave undue weight to the report of Dr. Leber, a consulting physician who did not even have the other doctors' reports when he made his evaluation. On remand, the Secretary must accord proper weight to the reports of Wilson's treating physicians, Drs. Hobby and Osher.

■ The ALJ determined that Wilson could perform a wide range of sedentary work. In his deposition, Dr. Osher stated that Wilson

> probably would not have been able to stay in any one position for an extended period of time or do any lifting of things over twenty or twenty-five pounds on a repeated basis and probably would have had to change positions frequently, be able to sit down, lie down or whatever, to keep himself comfortable.

*Id.* at 183. 20 C.F.R. Sec. 404.1567(a) (1983) defines sedentary work as

> involv[ing] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files,

---

1. We recognize that 20 C.F.R. Sec. 404.1527 (1983) provides that

> We [the SSA] are responsible for determining whether you are disabled. Therefore, a statement by your physician that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

> We have to review the medical findings and other evidence that support a physician's statement that you are "disabled."

However, this section does not mean that a treating doctor's statement as to disability is entitled to no weight.

ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Dr. Osher's statement does not necessarily preclude a wide range of sedentary work; in fact, it indicated that claimant could lift significantly more weight than required under the sedentary category. The ALJ did not err in concluding that Wilson could perform a wide range of sedentary work.

In order to apply the grids, the ALJ determined Wilson's residual functional capacity (RFC) and vocational factors. He concluded that Wilson was a younger individual 18–44 with a high school degree or more who was capable of performing a wide range of sedentary work. He also found Wilson to be skilled or semi-skilled; transferability of skills was not determined. Use of the grids by the ALJ requires us to consider their validity.

In *Broz v. Schweiker,* 677 F.2d 1351 (11th Cir.1982), *vacated and remanded sub nom. Heckler v. Broz,* —— U.S. ——, 103 S.Ct. 2421, 77 L.Ed.2d 1311, *adhered to,* 711 F.2d 957, *modified,* 721 F.2d 1297 (11th Cir.1983), we held that the Secretary could not use the grids that she had adopted concerning age to establish conclusively a claimant's ability to adapt. In *Reeves v. Heckler,* 734 F.2d 519 (11th Cir.1984), we explained how the Secretary could use the age grids in establishing the claimant's ability to adapt. The evidentiary determination we outlined in *Reeves* has not been made in this case. The record shows the ALJ applied the age grids in a mechanical fashion. On remand the district court should give Wilson the opportunity to make a proffer of evidence on his ability to adapt. If Wilson makes a proffer of substantial evidence that an ALJ could find credible and tending to show that the claimant's ability to adapt to a new work environment is less than the level established under the grids for persons his age, the

district court shall remand the case to the Secretary and direct that the Secretary reconsider the age/ability to adapt issue. If the claimant fails to make such a proffer, the ALJ's mechanistic use of the age grids would be harmless error and there would be no need to remand to the Secretary on this issue.

VACATED and REMANDED.