Marion **COLLORD**, Plaintiff,

v.

Margaret **HECKLER**, Secretary of Health and Human Services, Defendant.

Nos. 85 C 1779, 84 C 4963.

United States District Court, N.D. Illinois, E.D.

Feb. 28, 1986.

Deborah Spector, Deborah Spector & Associates, Chicago, Ill., for plaintiff.

Gregory Jones, U.S. Atty., c/o Robert T. Grueneberg, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiff Marion Collord ("plaintiff") instituted this action pursuant to 42 U.S.C. § 405(g) for review of two final decisions of the Secretary of the Department of Health and Human Services (the "Secretary") denying plaintiff's request for supplemental security income ("SSI") benefits. Plaintiff has filed a motion for "summary reversal" which the Court has construed as a motion for summary judgment. The Secretary has neither responded to plaintiff's motion nor filed a cross-motion for summary judgment, and has indicated to the Court that it does not intend to do so. For the reasons set forth below, the Secretary's decision will be reversed and summary judgment in favor of the plaintiff will be granted.

### I. *Procedural History.*

Plaintiff initially filed her application for SSI benefits on August 27, 1982. Plaintiff's application alleged that she was disabled due to narcolepsy and cataplexy. Narcolepsy is "a rare syndrome of recurrent attacks of sleep, sudden loss of muscle tone (cataplexy), sleep paralysis, and hypnagogic phenomena...." Merck Manual, 14th Ed., p. 1322, attached as Exhibit A to Plaintiff's Memorandum in Support of Mo-

tion for Summary Reversal. Cataplexy is a sudden nervous shock resulting in paralysis. *Webster's New Twentieth Century Dictionary*, unabridged version, 2d ed., 1983.

After plaintiff's initial request for SSI benefits was denied, she filed a request for reconsideration. Her request for reconsideration was also denied, primarily because the Secretary believed plaintiff's condition could be controlled through medication which plaintiff had stopped taking on her own. *See* R. 101. Plaintiff requested an administrative hearing on her claim, which was held on May 25, 1983. Plaintiff was not represented by counsel at this initial hearing and her claim was denied by the administrative law judge ("ALJ"). The Appeals Council of the Department of Health and Human Services adopted the ALJ's decision as the Secretary's final decision in the matter. Plaintiff, by this time represented by counsel, filed a civil action in this Court, No. 84 C 4963, challenging the Secretary's decision. Because the record of plaintiff's administrative hearing could not be located, Judge Moran, before whom the matter was then pending, entered an order remanding the case for a new hearing and the issuance of a new opinion. Judge Moran's order was entered on November 28, 1984. Pursuant to Judge Moran's order, the Appeals Council ordered a new hearing on January 19, 1985.

While plaintiff's initial claim was proceeding through the labyrinth of administrative and judicial channels, plaintiff filed a second application for SSI benefits, again alleging that she was disabled due to narcolepsy and cataplexy. Plaintiff's second application was dated January 12, 1984. R. 158. Apparently this second application was also denied initially and upon reconsideration, although documentation of these administrative actions is not in the record. Plaintiff filed a request for an administrative hearing on this second claim. The administrative hearing was held on September 26, 1984. On October 22, 1984 the ALJ denied plaintiff's second disability claim. After the Appeals Council adopted the ALJ's opinion as the final decision of the Secretary, plaintiff filed a second civil action, No. 85 C 1779. The two civil actions were later consolidated.

In seeking review in this Court, plaintiff contends that the decision of the ALJ, adopted by the Secretary, is not supported by substantial evidence.

■ Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Although a district court reviewing a disability determination by an ALJ should not reweigh the evidence or substitute its judgment for that of the ALJ, *Johnson v. Weinberger*, 525 F.2d 403, 406–7 (7th Cir.1975), this Court must do more than merely rubberstamp the ALJ's determination. *Garfield v. Schweiker*, 732 F.2d 605, 609–610 (7th Cir.1984). The Court, therefore, has reviewed the testimony provided to the ALJ, physicians' reports and other medical evidence and has concluded that the Secretary's decision is not supported by substantial evidence. The evidence presented in this case leads to the inevitable conclusion that plaintiff is disabled and is therefore entitled to SSI benefits.

## II. *Evidentiary Record.*

At the time of her administrative hearing, plaintiff was 39 years old with the equivalent of a high school degree. Plaintiff testified that her narcolepsy causes an abnormal and irresistable urge to sleep dozens of times a day. The sleep episodes last from minutes to one-half hour each, from which the plaintiff may awake groggy and disoriented. R. 42–49.

Plaintiff's cataleptic condition causes periodic, if brief, episodes of complete paralysis which can occur without warning, can happen frequently throughout the day and are precipitated by any type of emotional response. R. 44–50. Additionally, plaintiff testified that she suffers from related disorders: sleep apnea, which momentarily causes cessation of breathing during sleep

(R. 48–49) and hypnagogic hallucinations, which are very frightening and during which plaintiff cannot distinguish reality from fantasy (R. 48). Plaintiff's condition was diagnosed when she was in her twenties, although the sleep attacks started when she was in high school. R. 41. The disease has no cure, is progressive and has become progressively worse. R. 41, 49, 217.

Plaintiff was treated with a drug called Ritalin, but ceased taking it because of the hallucinations and suicidal depression she experienced as side effects. R. 51, 53, 126. Dr. Rollo, a clinical psychologist, also noted that the Ritalin was having little effect on plaintiff's condition. R. 196–197.

Plaintiff has also undergone biofeedback therapy with Della Rush, a qualified imaging therapist. Ms. Rush testified at the hearing in both her capacity as plaintiff's therapist and in her capacity as a personal friend who had witnessed many of plaintiff's attacks. R. 54. Plaintiff's biofeedback training has allowed her to become aware of an impending attack so that she can take adequate measures to protect herself from injury. R. 41–42, 196–97.

Plaintiff testified that the naroleptic and catapletic attacks have increased in frequency during the two years preceeding the hearing. R. 42. Ms. Rush testified that she has personally seen plaintiff undergo 10 to 25 catapletic attacks in a single day. Plaintiff testified that as a result of those attacks, plaintiff can do little by herself. Plaintiff has only brief periods of alertness when she can be active, cannot stay awake through a 20-minute church service or a TV program, and sleeps for a substantial part of the day. R. 45, 65.

Plaintiff has held down two jobs in her lifetime. Her first job was as a receptionist for Guy Joassin, M.D. Dr. Joassin's letter states the nature of plaintiff's employment and the problems she experienced while on the job:

> Marion Collord has been in my employ for three and one half years. The first three years as a part time (15 to 20 hours) per week, and was able to function with a minimal amount of sleep attacks. She became a full time employ February 1, 1982, she has shown a continuous increase in sleep attacks, which are now impairing her job performance, it is also becoming a serious problem for her to drive to and from work within a safety margin. My only recourse at this time is to reduce her hours to part time again, hopefully reducing her exhaustion, and amount of sleep attacks at work. It is my opinion as her employer she should not work more than a parttime week for health purposes, as it effects her job performance by the increased number of sleeping attacks she suffers from full time employment.

R. 198.

Plaintiff was terminated sometime in 1982 because of the increased frequency of her attacks. R. 41.

Plaintiff's only other job was as a parttime hostess in a restaurant working 10 to 15 hours per week. R. 50. Plaintiff held this job for six months and earned $3.50 an hour. The restaurant manager also submitted a letter explaining why plaintiff was terminated:

> Marion Collord was employed by Fazio's restaurant last year, 1983. She obtained the job because they were friends of the family. They understood she had narcolepsy and cataplexy but tried to accomodate her problems by allowing her to arrive late when she would have a sleeping seizure on the way. She was also allowed to take a break to sleep when seizures occurred.
>
> It became increasingly dangerous to continue to keep her employed because of paralysis attacks. She had one attack while removing pizza from the oven and was burnt on the oven. She also dropped a tray of water glasses when an attack occurred. She was unable to stay awake when counting out the cash drawer, at which time hundreds of dollars were scattered over the floor while she slept through a seizure.

R. 214.

Two witnesses, Ms. Rush and plaintiff's sister, both of whom see plaintiff frequent-

ly and know her well, testified at plaintiff's hearing. Both have observed frequent attacks. Ms. Rush described the sleep and catapletic attacks. R. 55–56. She described plaintiff as appearing increasingly drowsy, "looks heavier, responds in much slower fashion." R. 55. During a catapletic attack, plaintiff's body will involuntarily jerk, her arms fling out, and her head will be thrown back. R. 56. Ms. Rush noted that as a trained therapist, she is able to observe less dramatic attacks that an untrained person might otherwise be unable to detect.

Plaintiff's sister attested that "much of [plaintiff's] wake time is not alert time. She's either coming in or going out of a seizure and she tries fighting it, but ... it always gets the best of her." R. 60. She estimated that plaintiff has less than an hour of continuous wake time "where we can carry on a conversation." R. 61. She verified that plaintiff's condition is worsening. R. 62.

The medical evidence presented to the ALJ included reports from Dr. A. Wilcox, plaintiff's treating physician (R. 186, 200–02, 216–18); Dr. Nabil Biary, a neurologist (R. 126–27); Dr. Danilo B. Soziano (R. 118); and Dr. H. Rollo, a clinical psychologist (R. 196–96). All of the physicians' reports concurred in the diagnosis of narcolepsy and cataplexy. Dr. Wilcox's reports confirmed that plaintiff suffers from continuous attacks all through the day, causing plaintiff many minor injuries, *e.g.* cuts, burns and pulled muscles. R. 202, 216. The neurologist's report confirmed that the narcoleptic episodes "could happen at any time and while the patient is doing almost anything." R. 126. Dr. Rollo confirmed that plaintiff's narcolepsy "is organically based," and that plaintiff has reached a "plateau of improvement" in her biofeedback therapy. R. 196–97.

Finally, a vocational expert was present at plaintiff's administrative hearing and was asked several questions. The vocational expert testified that less than 100 jobs exist in the Great Lakes area for someone with plaintiff's symptomology (R. 77). The vocational expert testified that if plaintiff's attacks occurred infrequently, she could return to her former work. R. 71. The vocational expert defined "infrequent," however, as less than three episodes a day. R. 82. She further testified that if plaintiff's mental capacity—alertness and concentration—was impaired, there would be no occupation of any unskilled nature at any level of exertion which plaintiff would be able to do. R. 72. If plaintiff was to receive additional training, the vocational expert calculated, plaintiff might find a job but it would be a "unique employment situation." R. 73. In sum, the vocational expert concluded: "I would be hard pressed to find a suitable employment slot for an individual with [plaintiff's] symptomology...." R. 75.

### III. *The ALJ's Opinion.*

Despite this overwhelming and uncontradicted evidence of the nature and degree of plaintiff's condition, the ALJ found plaintiff not disabled under the rules and regulations of the Social Security Administration (the "Regulations"). From the analysis and findings of the ALJ's opinion, the Court has determined that the ALJ believed the following reasons justified denying plaintiff's claim:

1. The ALJ in plaintiff's earlier administrative hearing had found plaintiff not disabled.

2. Dr. Wilcox had apparently never witnessed a narcoleptic episode.

3. Dr. Joassin, in 1982, had recommended that plaintiff be limited to part-time work.

4. Plaintiff's impairments do not meet or equal any of the impairments listed in the Regulations.

5. Plaintiff's biofeedback instructor was a close personal friend.

6. The medical evidence does not substantiate a need to sleep a great deal of the time.

7. Plaintiff's catapletic spells are very brief in duration.

8. Plaintiff has functioned with her condition since her teenage years and, de-

spite her condition, is able to drive short distances.

9. Plaintiff's testimony was not fully credible.

10. Plaintiff did not fall asleep during the hearing.

R. 19–21. The ALJ concluded that plaintiff was able to perform her former work as a medical receptionist for 20 to 30 hours per week. R. 21.

The decision of the ALJ is not supported by substantial evidence. The evidence submitted to the ALJ establishes beyond a doubt that plaintiff suffers a disability equivalent to one of the impairments listed in the Regulations. Moreover, the evidence leaves no doubt that plaintiff cannot perform her past work as a medical receptionist and indeed lacks the capacity to perform any substantial gainful activity.

According to the Regulations, if a claimant has a disability that meets or equals an impairment listed in Appendix 1, the claimant will be deemed disabled regardless of age, education and work experience. *See* 20 C.F.R. § 404.1520(d). Medical "equivalence" is determined by comparing the plaintiff's symptoms, signs and laboratory findings concerning her disability with an impairment listed in Appendix 1.

The medical evidence in this case supports the conclusion that plaintiff's condition is statutorily equivalent to the listed impairment of epilepsy. The listing provides as follows:

> Epilepsy—minor motor seizures, (Petit mal, psychomotor, or focal), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. § 404, Subpart P, Appendix 1, § 11.03. Section 11.00 A of the Listing provides further that:

> In convulsive disorders, regardless of etiology, severity will be determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

> \*   \*   \*   \*   \*   \*

> ... a severe impairment is considered present only if it persists despite the fact that the individual is following prescribed anticonvulsive treatment.

Although Dr. Wilcox had not personally witnessed one of plaintiff's narcoleptic episodes, several witnesses testified concerning the nature and severity of plaintiff's condition. These accounts were neither inconsistent nor contradicted by any other evidence. There is simply nothing in the record to suggest, moreover, that Dr. Wilcox did not believe that plaintiff's condition was as she stated it. In fact, all of Dr. Wilcox's medical reports confirm plaintiff's description of her symptomology, and confirm that the disease has no cure.

The medication plaintiff attempted to use was both ineffective and creating intolerable side effects.

■ In sum, the uncontradicted evidence in this case concerning the "type, frequency, duration and sequelae" of plaintiff's attacks leads inexorably to the conclusion that plaintiff's condition is statutorily equivalent to epilepsy.

■ The Court's review of this case leads it to conclude that the ALJ impermissibly disregarded uncontradicted evidence regarding plaintiff's disability. *See Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1984). The record further indicates

that the ALJ improperly engaged in what the United States Court of Appeals for the Eleventh Circuit has termed "sit and squirm" jurisprudence. As that Court explained:

"In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant falls short of the index, the claim is denied."

*Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir.1984), quoting from *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). Plaintiff's biofeedback instructor testified that many of plaintiff's cataleptic fits are observable only to a trained eye. Plaintiff testified that the adrenalin in her system had kept her awake, but that her eyes were heavy and she was sleepy at the end of her testimony. R. 67. The ALJ is not a medical expert, and cannot use his own observation to overcome the overwhelming medical evidence regarding the nature and degree of plaintiff's illness.

■ The ALJ's conclusion that plaintiff is capable of performing her past relevant work as a medical receptionist is similarly unsupported. Dr. Joassin, who had employed plaintiff as a part-time receptionist despite her condition, terminated plaintiff in 1982 because her sleep attacks had become such a serious problem. R. 41. The evidence was undisputed that plaintiff's condition had worsened considerably in the years following her employment with Dr. Joassin.

■ The vocational expert's testimony, moreover, supports the conclusion that plaintiff is not employable except in a unique employment situation by a very tolerant employer. R. 71–74. Any reasonable reading of the vocational expert's testimony in response to the ALJ's questioning leads to the conclusion that the vocational expert did not believe that plaintiff was able to perform substantial gainful activity as that term is defined in the Regulations. 20 C.F.R. § 404.1572.

In sum, the record supports the conclusion that plaintiff suffers from narcolepsy and cataplexy and that these diseases are the statutory equivalent of the listed impairment of epilepsy. The record also shows that plaintiff is incapable of performing any substantial gainful activity. Plaintiff must be awarded SSI benefits.

*Conclusion*

Plaintiff's motion for summary reversal, construed as a motion for summary judgment, is GRANTED.