**Daniel SELLERS, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A. 00–W–1115–N.**

United States District Court, M.D. Alabama, Northern Division.

Sept. 4, 2002.

Laura E. Nolan, Montgomery, AL, for Plaintiff.

R. Randolph Neeley, U.S. Attorney's Office, Montgomery, AL, for Defendant.

## MEMORANDUM OF OPINION

WALKER, United States Magistrate Judge.

Daniel Sellers brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income and disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be AFFIRMED.

### FACTS

On June 30, 1998, the plaintiff filed applications for disability insurance benefits and Supplemental Security Income. (R. 68–70, 198–199). The plaintiff claims that he is disabled because of nerve disorders, severe back pain, loss of grip strength in the right hand, pain in the feet and legs, bronchial asthma, and mental retardation. (R. 75, 103, 127). The plaintiff also claims he is disabled because of arthritis, dizziness, "low blood," and problems with his feet associated with gout. (Plaintiff's Brief, 1).

On June 23, 1999, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The plaintiff was 35 years old at the time of the hearing decision. (R. 32). Plaintiff's previous work experience included bee worker, tree cutter, groundskeeper, commercial cleaner, and construction worker. (R. 43). He completed 10th grade. (R. 33–34).

The plaintiff testified that he is 5′11″ and weighs approximately 280 pounds. (R. 32). He stated that the blood circulation in his right hand is bad and causes him to be unable to grip or grasp with that hand. (R. 33). He stated he repeated four or five grades and left school after the tenth grade when he was approximately 20 years old. (R. 33–34). He also stated that he was in special education classes while in school. (R. 34). The plaintiff testified that he could not work because of the pain in his back and gout in his legs. (R. 35). The plaintiff also stated that his "nerves" bother him and he sometimes becomes weak due to anemia. (R. 36). The plaintiff said that he can stand approximately an hour and a half before he becomes dizzy and nauseated and must sit. (R. 37). He becomes uncomfortable after sitting between thirty minutes and an hour. (R. 37). He can walk a mile, although not every day when his feet are swollen and bother him. (R. 37). The plaintiff reported that he would be seeing his physician in two or three weeks regarding the possibility of removing his toenails because of the gout. (R. 38).

The plaintiff testified that his feet swell up every two to three weeks and that the swelling lasts approximately three days to a week. (R. 38). He indicated that he spends his days at home and that he sits and watches television. (R. 38). The plaintiff stated that his mother does the cooking, the dishes, and the laundry and that he does not help although he takes out the trash sometimes. (R. 39). When

asked about friends, the plaintiff testified that he mostly spends time by himself or with his brother. (R. 39). He goes to mental health every week and he is being treated for his nerves although he is not on any medication for mental problems. (R. 39–40). The plaintiff also testified that he cannot read a newspaper and cannot write very well. (R. 40). He said that he had problems with the tests given by the consultative psychologists because he could not read. (R. 41). He further testified that he told his examiners he could not read and that he did his best on the tests administered. (R. 41).

The ALJ subsequently rendered his decision, in which he found that: (1) the plaintiff met the disability insured status requirements of the Act on the alleged onset date of disability and continued to meet them through December 1996; (2) the plaintiff has not engaged in substantial gainful activity ("SGA") since the alleged onset date of disability; (3) the plaintiff has the "severe" impairments of borderline intellectual functioning, dysthymic disorder, mild, and malingering, but these impairments, whether considered individually or in combination, do not meet or equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) the plaintiff's allegations of pain and functional limitations are not credible; (5) the plaintiff has the residual functional capacity to perform work within the limitations as set forth in the functional capacity assessment completed by Dr. Warren, dated February 5, 1999; (6) the plaintiff can perform his past relevant work; and (7) the plaintiff is, therefore, not disabled.

### I. Standard of Review

■ The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence of substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. *Davis v. Shalala,* 985 F.2d 528, 531 (11th Cir.1993); *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Cornelius,* 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis,* 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. *Cornelius,* 936 F.2d at 1145–46.

### DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that (1) the ALJ failed to properly weigh the evidence; (2) the ALJ failed to fully and fairly develop the record; (3) the ALJ erred in rejecting the plaintiff's pain testimony; (4) the ALJ failed to review the impairments in light of the plaintiff's prescription medications; and (5) the ALJ failed to consider the entire record.

### Weight of the Evidence

Within the structure of the sequential evaluation process, the ALJ found that the medical evidence establishes that the plaintiff has the "severe" impairments of borderline intellectual functioning; dysthymic disorder, mild; and malingering. (R. 18). However, the ALJ also found that the plaintiff does not have an impairment or combination of impairments listed in or

medically equal to one listed in Appendix 1, Subpart P, Regulation No.4 (R. 34). The ALJ further found that the plaintiff's subjective complaints are not medically determinable impairments, as they are not demonstrable by medically acceptable clinical or laboratory diagnostic techniques. (R. 18).

The plaintiff contends that the ALJ erred in failing to give proper weight to properly administered psychological tests and thus failing to find that he meets all the requirements of 20 C.F.R., Pt. 404, subpt. P, App. 1, Listing 12.05(B).[1] The plaintiff submits that he has a valid verbal, performance, or full scale I.Q. of 59 or less required by Section 12.05(B).

Plaintiff's medical records indicate various psychological testing. (R. 127–131, 139–142, 143–185, 190–197). In November 1979, psychometrist James Stanfield administered the Wechsler Intelligence Scale for Children–Revised (WISC–R) for purposes of evaluating the plaintiff for special education needs classes in school. (R. 130). The plaintiff's verbal I.Q. was 55, his performance I.Q. was 60, and his full scale I.Q. was 52. (R. 130). Because the test administrator was a psychometrist, he made no findings as to the validity of the test, but a letter from the psychometrist on behalf of the Lowndes County Public Schools in August 1998 indicates the plaintiff was never placed in special education classes. (R. 122).

The record further reflects that the plaintiff was examined by Dr. Kimberly Whitchard on September 4, 1997. The plaintiff was administered the Wechsler Adult Intelligence Scale–Revised (WAIS–R) and scored a verbal I.Q. of 57, a performance I.Q. of 55, and a full scale I.Q. of 53. (R. 129). Dr. Whitchard determined that the plaintiff's test scores were not valid because he attempted to give wrong answers. (R. 129). She also noted that the plaintiff exhibited minimal effort during the testing. (R. 129).

The plaintiff was initially assessed at Montgomery Area Mental Health Authority ("MAMHA") in May 1998 to rule out mental retardation. (R. 148). The plaintiff reported problems with a depressed mood, sadness, hopelessness, and diminished interest or pleasure. (R. 149). He also indicated anxiety and "nerves" as well as trembling and shaking. (R. 149). The plaintiff reported that his brother was paralyzed eleven years earlier while playing with the plaintiff and that he feels guilty and responsible for his brother. (R. 149).

The plaintiff was administered another psychological evaluation on August 27, 1998, by Dr. Glen King of Kirkland, King, and Renfro. (R. 139). The plaintiff complained of physical problems including gout, back problems, and lightheadedness. (R. 139). He reported problems with his "nerves" but only one previous visit to a mental health center. (R. 140). He was administered the WAIS–R and scored a verbal I.Q. of 57, a performance I.Q. of 61, and a full scale I.Q. of 56. (R. 141). Dr. King stated that he did not feel that the

---

1. Section 12.05(B) provides:

12.05 *Mental Retardation and Autism:* Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22). (Note: The scores specified below refer to those obtained on the WAIS, and are used only for reference purposes. Scores obtained on other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning.) ...

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\* \* \* \* \* \*

B. A valid verbal, performance, or full scale IQ of 59 or less.

plaintiff was malingering when he was unable to give the year, and gave an incorrect month. (R. 140). Dr. King further noted that the plaintiff appeared to be focusing on physical problems to avoid responsibilities and normal life activities. (R. 141). Dr. King stated that the plaintiff's adaptive skills indicated he was capable of functioning in a general labor position and should be able to do simple to mildly varied tasks with supervision and repetition. (R. 141). Furthermore, despite the plaintiff's low I.Q., Dr. King observed that he would be able to manage any funds awarded. (R. 141–142).

Dr. Warren Brantley and Dr. Charles Smith, both of MAMHA, completed a diagnostic evaluation of the plaintiff after a September 1998 evaluation by Dr. Smith. (R. 144). Dr. Smith indicated that the plaintiff stated that he accidentally broke his brother's neck thirteen years before. (R. 144). Although the plaintiff expressed guilt over the accident, Dr. Smith stated that he had to remind the plaintiff about his guilt throughout the examination process. (R. 144).

Dr. Smith found the plaintiff to suffer from residual minimal dysthymic disorder,[2] borderline intellectual functioning, and intermittent malingering. (R. 144). Dr. Smith noted that the plaintiff has a history of malingering on IQ tests. (R. 145). Dr. Smith stated that his interview with the plaintiff indicated that the plaintiff "basically functioned independently with the household setting and was an asset to his parents and assisted with the care of his quadriplegic brother." (R. 146). He further indicated that the plaintiff's intermittent malingering was "quite obvious" and that his overall functions were in the bor-

derline intellectual range of functioning. (R. 146). Dr. Smith also found the plaintiff to be evasive regarding his alcohol use and stated he would not be surprised if the plaintiff abused alcohol. (R. 146).

In discussing the plaintiff's problems, Dr. Smith stated that some of the plaintiff's problems with thought processes were real, but others were "basically made up." (R. 146). Dr. Smith also noted that the plaintiff's affect was flat, but he stated this also "appeared to be put on." (R. 146). The plaintiff's insight and judgment appeared to be in the mid-to uppermost range of borderline intellectual functioning. (R. 146). Dr. Smith found that, psychologically, the plaintiff is employable and can probably manage his own funds. (R. 146).

The plaintiff returned to MAMHA in May 1999. (R. 190). He presented with depressed mood, disturbed sleep pattern, bad nerves, difficulty with memory and concentration, and several physically related problems. (R. 192). He was diagnosed with dysthymic disorder and, after a diagnostic evaluation, the plaintiff was diagnosed with borderline intellectual functioning as well. (R. 192,196).

■ Although the plaintiff's standardized I.Q. test scores obtained from school testing, Dr. Whitchard, and Dr. King all indicate mental retardation, the Court of Appeals "has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir.1992), *Popp v. Heckler,* 779 F.2d 1497 (11th Cir.1986). In the

---

**2.** Dysthymic disorder is " a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (as eating and sleeping distur-

bances, fatigue, and poor self-esteem)." Merriam–Webster's Medical Desk Dictionary 225–226 (1996).

instant case, the administrative record supports the ALJ's finding that the plaintiff, notwithstanding his I.Q. score, is not mentally retarded within the meaning of listing 12.05(B). (R. 18). If the ALJ concludes from other evidence in the record that the I.Q. scores are inconsistent with the plaintiff's actual intellectual functioning, the ALJ may properly find that the plaintiff does not meet the criteria of listing 12.05. The ALJ's decision is reviewable by the court for substantial evidence.

In concluding that the plaintiff's I.Q. scores were inconsistent with the plaintiff's actual intellectual functioning, the ALJ viewed the test results along with evidence in the record regarding the daily activities and behavior of the plaintiff stating:

> In 1979, the claimant did obtain IQ scores that were reflective of mental retardation. Nonetheless, the exam was administered by a psychometrist, who, under the guidelines of § 12.00D, is not qualified to perform such an evaluation. Specifically, § 12.00D states that in cases involving impaired intellectual functioning, a standardized intelligence test, should be administered and interpreted by a psychologist or psychiatrist qualified by training and experience to perform such an evaluation. Even assuming arguendo that the psychometrist should be considered qualified to administer the test, the psychometrist failed to provide an opinion as to the validity of the results. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00D, also provides that test results should include both the objective date and a narrative report of clinical findings. The narrative report should include a discussion of whether the obtained IQ scores are considered valid and consistent with the

individual's development history and degree of functional restriction. Since the 1979 IQ test results do not meet either of the above requirements of section 12.00D, I find that they can be given no evidentiary weight.

> The claimant earned similar I.Q. scores when given the test by Dr. Whitchard, who is a licensed psychologist. Dr. Whitchard opined that the results were invalid as the claimant attempted to give wrong answers and exhibited minimal effort.

> In 1998, Dr. King diagnosed moderate mental retardation based on low IQ scores obtained on a test he administered. Dr. King believed the results were valid; however, he did not have available the claimant's prior testing history, the records from MAMHA, or the results of Dr. Babb's examination, all of which show the claimant's propensity for malingering.[3] On consideration of the entire record, I find that it is more likely to be true than not true that the IQ results obtained on testing by Dr. King are also reflective of malingering.

> Moreover, even assuming arguendo that the results reported by Dr. King were valid, this would be insufficient to establish that he meets a listing for mental retardation for in order to do so a claimant must not only have significantly subaverage general intellectual function, but he must also have deficits in adaptive behavior. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.05. Dr. King opined that the claimant had quite a few adaptive skills that should render him capable of functioning in a general type labor position. Dr. King's observation is borne out by the testimony of the Vocational Expert (VE) which establishes

---

**3.** The claimant told Dr. King he was in Special Education. Dr. King also did not have access to the statement from Lowndes County

Public Schools that the claimant was never a special education student.

that the claimant has a work history that includes both unskilled and semi-skilled work.

The majority of the claimant's mental heath treatment has been provided by the MAMHA. The physicians there found his intelligence to be at the mid to uppermost range of borderline intellectual functioning. His most recent treatment plan (May 1999) shows borderline intellectual functioning as part of his diagnosis. On consideration of the record, I find that the diagnosis of borderline intellectual functioning offered by MAMHA is the most accurate assessment of his true level of intellectual functioning.

(R. 19–20).

Ample evidence exists in the record to support the ALJ's decision that the plaintiff does not meet listing 12.05(B). The plaintiff presented no evidence of the validity of the 1979 test scores and therefore, they cannot be accepted as valid. Furthermore, both Dr. Whitchard and the doctors of MAMHA found that the plaintiff was malingering. (R. 129, 145–147).

Additionally, while Dr. King did not find the plaintiff the plaintiff to be malingering, he noted that plaintiff had the requisite adaptive functioning necessary to be employed. (R. 140–142). As the ALJ concluded, even if the plaintiff's IQ scores were considered valid, the plaintiff does not have deficits in adaptive functioning that would render him mentally retarded. For these reasons, the court finds no error in the ALJ's decision and finds as well that the ALJ's decision is supported by substantial evidence and is the result of the application of appropriate legal standards. Thus, the plaintiff's contention that the ALJ did not give proper weight to his psychologist and that his test scores did meet the requirements of Section 12.05(B) is without merit.

## Full and Fair Record

The plaintiff argues that the ALJ failed to develop the record fully and fairly because he discounted the opinion of the plaintiff's treating physicians from Lowndes County Health Center regarding the plaintiff's back pain and gout without obtaining additional examinations and tests. The plaintiff also claims that the ALJ failed to develop the record regarding the plaintiff's claims of gout and dizziness in light of his prescribed medications. The plaintiff claims that the ALJ should have considered that plaintiff's medications included Indomethacin [4]—the drug of choice for gout—before deciding that plaintiff's claim of gout is at most a non-severe impairment. The plaintiff also appears to suggest that he may suffer from Meniere's disease [5] because he has been prescribed Meclizine [6] for dizziness in the past. (Plaintiff's Brief, p. 8).

A review of the plaintiff's medical records indicates that Lowndes County Health Center has provided basic medical care to him since June 16, 1997. (R. 137). During his June visit the plaintiff com-

---

4. Indomethacin is also known as Indocin. It is "a nonsteroidal drug with anti-inflammatory, antipyretic, and analgesic properties." Effective in treating moderate to severe rheumatoid arthritis, moderate to severe ankylosing spondylitis, moderate to severe osteoarthritis, acute painful shoulder, and acute gouty arthritis. Physician's Desk Reference 53rd Edition 1812 (1999).

5. Meniere's disease is "a disorder of the membranous labyrinth of the inner ear that is marked by recurrent attacks of dizziness, tinnitus, and deafness." Merriam–Webster's Medical Desk Dictionary 481 (1996).

6. Meclizine "is effective in the management of nausea, vomiting and dizziness associated with motion sickness." Physician's Desk Reference 53rd Edition 2361 (1999).

plained of a cold and back pain and doctors prescribed 800 mg of Ibuprofen.[7] (R. 137). On November 14, 1997, the plaintiff arrived at the Center complaining of foot pain. (R. 136). An examination showed ankle and foot inflammation as well as moderate tenderness of the toes, but the plaintiff was able to bear a limited amount of weight on the foot and had fair strength. (R. 136). The plaintiff was prescribed Indocin[8] and told to apply heat to the area as needed. (R. 136).

The plaintiff returned in April 1998 complaining of back pain and stating that he had suffered from back problems for 3–4 years. (R. 135). The plaintiff further stated that bending aggravated the condition. (R. 135). The doctor's impression was that the plaintiff suffered from chronic back pain; accordingly he prescribed 800 mg of Motrin[9] and asked the plaintiff to return in one month. (R. 135). The plaintiff was treated again on May 29, 1998, and reported "feeling lightheaded and seeing stars." (R. 134). The plaintiff also indicated that he fell the day before when feeling dizzy but did not lose consciousness. (R. 134). In June 1998 the plaintiff stepped on a nail and was treated again. (R. 133). He was given a tetanus shot and no other problems were reported. (R. 133).

In August 1998, the plaintiff returned to the Lowndes County Health Center to have disability papers completed on his behalf. (R. 189). He did not return again until November 25, 1998, when he complained of swelling in his feet and "gouch." (R. 189). The plaintiff was unable to stand during the exam, but doctors noted that his right foot was swollen. (R. 189). The physician indicated that there was slight edema[10] of the plaintiff's right foot as well as tenderness "all over" the area. (R. 189). In April 1999 tests were completed on the plaintiff after he indicated that he felt weak and dizzy at times. (R. 188). The plaintiff returned for the lab results in May 1999 and no swelling of the foot was present at the time. (R. 187). The physician's impression was that the plaintiff suffered from a history of gout and he recommended that the plaintiff be treated at the Foot Clinic. (R. 187). The record does not indicate that the plaintiff ever sought treatment at the Foot Clinic or sought treatment from any other source regarding his allegations of gout.

The plaintiff was seen by Dr. Alan Babb on September 23, 1998, for a consultative examination. (R. 168). Dr. Babb noted that the plaintiff suffered mid-thoracic back pain from lifting his disabled brother. (R. 168). Dr. Babb also observed that the plaintiff's subjective back pain appeared to be "on demand" when he needed to complain while at other times he did not complain of pain when the doctor expected that he would. (R. 169). Dr. Babb noted

7. Ibuprofen is "a member of the propionic acid group of nonsteroidal anti-inflammatory drugs. (NSAIDs)." Physician's Desk Reference 53rd Edition 1675 (1999).

8. Indocin is "a non-steroidal drug with anti-inflammatory, antipyretic, and analgesic properties." It is effective in treating moderate to severe rheumatoid arthritis, moderate to severe ankylosing spondylitis, moderate to severe osteoarthritis, acute painful shoulder, and acute gouty arthritis. Physician's Desk Reference 53rd Edition 1812 (1999).

9. Motrin is "a pain reliever indicated for the temporary relief of headaches, muscle aches, the minor pain of arthritis, toothaches, backache, minor aches and pains associated with the common cold, the pain of menstrual cramps, and for reduction of fever." Physician's Desk Reference 53rd Edition 1674 (1999).

10. Edema is "an abnormal excess accumulation of serous fluid in connective tissue or in a serous cavity." Merriam–Webster's Medical Desk Dictionary 229 (1996).

that when the plaintiff's attention was taken away from his back motion he did not complain of the pain. (R. 169). Dr. Babb stated that he found that the plaintiff was willfully not giving proper answers. (R. 170). Dr. Babb indicated that the plaintiff was an overt malinger and was deceptive. (R. 170).

The ALJ is charged with developing a fair and full record. *Todd v. Heckler*, 736 F.2d 641, 642 (11th Cir.1984). In addition, the ALJ is bound to make every reasonable effort to obtain from the claimant's treating physician(s) all the medical evidence necessary to make a determination. 20 C.F.R. § 404.1512(d). However, as set out above, the burden is on the *plaintiff* to prove he is disabled. The Social Security Regulations provide in part:

> In general, you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled. This means you must furnish medical and other evidence that we can use to reach conclusions about your impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis.

20 C.F.R. § 404.1512(a).

Consultative examinations are not required by statute; however, the Regulations provide for them where warranted. *See* 20 C.F.R. § 404.1517. Those regulations provide:

> (a)(1) *General.* The decision to purchase a consultative examination for you will be made after we have given full consideration to whether the additional information needed (e.g., clinical findings, laboratory tests, diagnoses, and prognosis) is readily available from the records of your medical sources.
>
> (b) *Situations requiring a consultative examination.* A consultative examina-

tion may be purchased when the evidence as a whole, *both medical and non-medical,* is not sufficient to support a decision on your claim.

20 C.F.R. § 404.1519(a) (emphasis added).

■ While it is reversible error for an ALJ not to order a consultative examination when the evaluation is necessary for him to make an informed decision, *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir.1984), the ALJ is not required to order a consultative examination unless the record, *medical* and *non-medical,* establishes that such an examination is necessary to enable the ALJ to render a decision. *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir.1988) (citing *Ford v. Secretary of Health and Human Services*, 659 F.2d 66, 69 (5th Cir.1981)) (emphasis added).

■ Moreover, an impairment is not severe if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to perform basic work activities, irrespective of age, education, or work experience. *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984). Basic work activities, in turn, are defined as those abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 416.921 (2000).

The ALJ determined that he had all of the medical evidence necessary to determine which of the plaintiff's impairments were severe. This court's review of the medical evidence compels the same conclusion.

■ Although the plaintiff has been diagnosed with back pain and a history of gout, none of his physicians have imposed limitations on him physically. Substantial evidence supports the ALJ's finding that the plaintiff's back pain, gout, and dizziness are not severe impairments.

In making a determination regarding the plaintiff's claims of gout, the ALJ stated:

> ...an individual will never be found disabled based on his own alleged symptomatology, including pain, unless there are medical signs or findings showing that there is a medical condition which could be reasonably expected to result in such alleged symptomatology. The claimant complained of left leg and foot pain due to gout. However, on May 6, 1999, although he had a uric acid level of 9.1, there was no evidence of swelling or erysthrasma. Additionally, his diagnosis was shown as a history of gout. Thus, I find that his alleged gout does not constitute a medically determinable impairment. Assuming arguendo that it did constitute a medically determinable impairment, I find that it is not a "severe" impairment.

(R. 18).

Although the plaintiff indicated that he takes Indomethacin for pain in his feet and legs due to gout, and Meclizine for dizziness, he has not suggested that his medications cause limitations due to side effects. (R. 125–126). Furthermore, medical records indicate that the Indomethacin has relieved some of the plaintiff's symptoms. This includes lab results from May 6, 1999, that show that the plaintiff was suffering no swelling and only a slightly elevated uric acid level of 9.1. (R. 187). Likewise, the record contains no objective evidence of the plaintiff's back pain and dizziness. The only evidence of the plaintiff's back pain and dizziness is his own subjective complaints.

█ A diagnosis alone is an insufficient basis for a finding that an impairment is severe. The severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality. *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir.1986). Objective medical evidence must confirm that the impairment is severe. *See* SSR 96–3p.[11] Considering the relevant evidentiary facts and applicable standards, substantial evidence supports the ALJ's conclusion that the plaintiff's back pain, gout, and dizziness are not severe impairments despite the medications prescribed to treat the plaintiff.

No reports indicate functional limitations for the plaintiff or limitations in his physical abilities. Nothing in the record indicates that the plaintiff suffers from any physical problems because of his back pain, history of gout, dizziness, or his medications Indomethacin and Meclizine. Therefore, the plaintiff has not met his burden of showing that his impairments

---

**11.** SSR 96–3p of the Social Security Administration sets forth a policy interpretation ruling in considering allegations of pain and other symptoms to determine whether a medically determinable impairment is severe. In relevant part, the interpretation provides:

> At step 2 of the sequential evaluation process, an impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities....*A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.*

> *Id.* (Emphasis added).

are more than a slight abnormality with more than a minimal effect on his ability to perform basic work activities.

In the instant case, the ALJ determined that the record did not support the need for further evaluation and that he had adequate information for a full assessment of the plaintiff's RFC. The evidence of record substantially supports the ALJ's conclusions regarding the severity of the plaintiff's alleged impairments and his decision not to order any additional consultative examinations or testing.

### Credibility of Plaintiff's Pain Testimony

Plaintiff argues that the ALJ improperly rejected his subjective complaints. "Subjective pain testimony supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the plaintiff complains is itself sufficient to sustain a finding of disability." *Hale v. Bowen,* 831 F.2d 1007 (11th Cir.1987). In examining a plaintiff's complaints of pain and other objective medical symptoms, "[t]he Secretary must consider a claimant's subjective testimony of pain if she finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir.1995) (citations omitted). Moreover:

> After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence. *Wilson v. Heckler,* 734 F.2d 513, 517 (11th Cir.1984). If the ALJ refused to credit subjective pain testimony where such testimony is critical, he must articulate specific reasons for question-

ing the claimant's credibility. *Walker,* 826 F.2d at 1004.

*Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir.1992) (citations omitted).

■ The ALJ must consider a plaintiff's subjective testimony of pain if he finds evidence of an underlying medical condition and the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain. *Mason v. Bowen,* 791 F.2d 1460, 1462 (11th Cir.1986); *Landry v. Heckler,* 782 F.2d 1551, 1553 (11th Cir. 1986).

In assessing the plaintiff's pain, the ALJ stated:

> I find that the claimant's testimony of disabling pain and functional restrictions is wholly disproportionate to the objective medical evidence. The record does not contain objective signs and findings that could reasonably be expected to produce the degree and intensity of pain and limitations alleged. There are no diagnostic studies to show abnormalities which could be expected to produce such severe symptoms. The physical findings in the record do not establish the existence of neurological deficits, significant weight loss, muscle atrophy, or other observable signs often indicative of protracted pain of the intensity, frequency, and severity alleged.

(R. 21). The ALJ also found that the plaintiff's testimony as to the level of his pain not credible. (R. 20). The ALJ specifically noted that

> . . . there are many factors that suggest that his allegations are less than credible and, in fact purposely designed to present himself in the worst possible light. For example, evidence of malingering is noted throughout the record. On September 4, 1997, Dr. Whitchard stated his IQ scores were felt to be

invalid, as he was described as attempting to give wrong answers and exhibiting minimal effort. Drs. Brantley and Smith diagnosed intermittent, but notable, malingering. Dr. Babb stated that he complained of back pain, but was in no distress, during the examination. After the examination, he got up, promptly walked to his car and jumped in. He also stated that the claimant was extremely unmotivated, clearly deceptive, evasive, and not believable in any respect. Dr. Babb stated that he appeared to be deliberately retarded, although intellectually and socially he did not appear so. Dr. Babb diagnosed, inter alia, "overt malingerer."

(R. 20).

■ The court finds no error in the ALJ's analysis of the plaintiff's subjective complaints of pain. His malingering constitutes substantial evidence upon which the ALJ could base his decision to discredit the testimony with regard to his subjective complaints of pain. The decision concerning the plaintiff's credibility is a function solely within the control of the Commissioner and not the courts. *Daniels v. Apfel*, 92 F.Supp.2d 1269, 1280 (S.D.Ala.2000)(citing *Grant v. Richardson*, 445 F.2d 656 (5th Cir.1971)). A clearly stated credibility finding should not be disturbed unless it is not supported by substantial evidence. *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986).

The ALJ also articulated other reasons for questioning the claimant's credibility. For example, he specifically noted that although the plaintiff testified to doing basically nothing around the house, the record indicates that he helps with household chores such as taking out the trash. (R. 20, 38–39, 78 110, 146). He also takes care of his parents and his paraplegic brother. (R. 20, 110–111, 115, 144, 146–147, 150). These activities alone do not necessarily prove the plaintiff's ability to engage in substantial gainful activity. Nevertheless, these activities, when taken together with the other inconsistencies articulated previously, undermine the plaintiff's assertions that his condition prevented him from working.

Upon reviewing the objective medical evidence in the record, the court concludes that substantial evidence exists to support the ALJ's conclusion that the plaintiff's allegations are not credible. Consequently, the court finds that the ALJ properly considered and analyzed the plaintiff's subjective testimony of pain. For all of these reasons, the court finds no error in the ALJ's decision and finds as well that the ALJ's decision is supported by substantial evidence and is the result of the application of appropriate legal standards.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the ALJ is due to be AFFIRMED.