**Cheryl DAUGHTRY, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 03–M–688–N.**

United States District Court, M.D. Alabama, Northern Division.

Feb. 19, 2004.

Micki Beth Stiller, Law Office of Micki Beth Stiller, Montgomery, AL, for Plaintiff.

R. Randolph Neeley, Leura Garrett Canary, U.S. Attorney's Office, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION

McPHERSON, United States Magistrate Judge.

Claimant Cheryl Daughtry ["Daughtry"] has filed this action seeking review of a final decision by the Commissioner (Doc. # 1) pursuant to §§ 405(g) and 1383(c) of the Social Security Act (Doc. # 10, p. 1). Upon review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner should be AFFIRMED for the reasons set forth herein.

## I. PROCEDURAL BACKGROUND AND FACTS

Daughtry petitioned for supplemental security income under Title II and Title XVIII of the Social Security Act on 30 October 2000 (R. 121), alleging a disability onset date in August 2000 (R. 121). By her own account, she is unable to work due to "TAH (ovarian tumor)[,] fibromyalgia, arthritis, chemical imbalance, [and] blackout spells" (R. 121). She was born on 10 February 1967 and was therefore 34 years of age at the time of the hearing (R. 121).

Daughtry dropped out of high school, completing only the 10th grade (R. 45). She later received specialized training as a certified nursing assistant (R. 46–47). Before her alleged disability, she had varied work experiences, including employment as a cashier, sewing machine operator, paper delivery person, fast food worker, seamstress, and certified nursing assistant (R. 86–87). She has not worked since August 2000 (R. 122).

After hearing Daughtry's petition for social security benefits on 8 November 2001 (R. 32–94), an Administrative Law Judge ["ALJ"] issued an adverse decision on 18 December 2001 (R. 14–28). The Appeals Council denied Daughtry's petition for review, thus rendering the ALJ's decision the Commissioner's final determination (R. 6–7). This action followed on 30 June 2003 (Complaint, Doc. # 1).

## II. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. Reviewing courts "may not decide the facts anew, reweigh the evidence, or substitute our

judgment for that of the [Commissioner]." *Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir.1996) (citing *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983)). The court must find the Commissioner's factual findings conclusive if they are supported by substantial evidence.[1] *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997). "There is no presumption, however, that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that the legal conclusions reached were valid." *Miles v. Chater,* 84 F.3d at 1400 (citations omitted).

## III. DISCUSSION

### A. Standard for Determining Disability

An individual who files an application for Social Security disability benefits must prove that he is disabled. *See* 20 C.F.R. § 416.912 (1999). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven that he is disabled. *See* 20 C.F.R. § 416.920 (1999). The ALJ must evaluate the claimant's case using this sequential evaluation process, *Ambers v. Heckler,* 736 F.2d 1467, 1469 (11th Cir.1984); *Williams v. Barnhart,* 186 F.Supp.2d 1192, 1195 (M.D.Ala.2002). The steps are as follows:

1. If the claimant is working or engaging in substantial gainful activity, he is not disabled. However, if the claimant is not working or engaging in substantial gainful activity, the Court must consider whether the claimant has a severe impairment.

2. If the claimant does not have a severe impairment, he is not disabled. A severe impairment is defined as a condition that precludes one from performing basic work-related activities. If the claimant has a severe impairment, the Court must then consider whether the impairment has lasted or is expected to last for more than twelve (12) months.

3. If a claimant's impairment has lasted or is expected to last for a continuous period of twelve (12) months or more and it is either included on or equivalent to an item in a list of severe impairments, as found in Appendix I of the regulations, the claimant is disabled. If neither of the above conditions, when considered in association with the continuity requisite of twelve (12) months, is deemed true, the ALJ must go on to step 4 of the evaluation sequence.

4. If it is determined that the claimant can return to previous employment, considering his residual functional capacity ["RFC"] and the physical and mental demands of the work that he has done in the past, the claimant will not be considered disabled. If it is determined that the claimant cannot return to previous employment, the SSA must continue to step 5 in the sequential evaluation process.

1. In *Graham v. Apfel,* 129 F.3d at 1422, the Court of Appeals has stated that:
 Substantial evidence is described as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

5. If, upon considering the claimant's RFC, age, education, and past work experience, the SSA determines that the impairments determined do not preclude the claimant from performing a significant number of jobs that are available in the national economy, the claimant will not be considered disabled within the meaning of the Social Security Act. Therefore, she/he will not be entitled to benefits pursuant to 42 U.S.C. §§ 401 et seq. and/or 42 U.S.C. §§ 1381. If, however, it is determined that there are not a significant number of jobs the claimant can perform available in the national economy and the impairment meets the duration requirement, the claimant will be considered disabled.

*See* §§ 20 C.F.R. 404.1520(a)-(f), 416.920(a)-(f).

## B. The ALJ's Findings

The ALJ made the following findings within the structure of the sequential evaluation process as outlined above:

1. Daughtry has not engaged in any substantial gainful activity since her alleged disability onset date (R. 26).

2. Daughtry has the following severe impairments: severe impairments of sacroiliitis on the right side, peripheral joint swelling involving the PIP and metacarpal phalangeal joints, anxiety disorder, NOS, and dysthymia (R. 26).

3. Although Daughtry has severe impairments, when considered individually and in combination, these impairments do not meet or equal in severity, any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 26).

4. Daughtry's allegations regarding her pain and functional limitations are not entirely credible (R. 26).

5. Daughtry does possess the residual functional capacity to perform her past relevant work (R. 27).

6. Daughtry has not been under a disability at any time through the date of this decision (R. 27).

## C. Application of the Standard

Based on the ALJ's findings, Daughtry survives step one and step two of the sequential evaluation process, because she has not engaged in any substantial gainful activities since her alleged onset date and she has severe impairments (R. 26). However, she does not survive step three, because her severe impairments, when considered individually and/or in combination with others, do not meet the equivalent of a listed impairment (R. 26). As a result, according to the ALJ, Daughtry is not disabled within the meaning of the Act (R. 27).

As a matter of law, even if the ALJ determines at step three of his analysis that a claimant does not have a combination of impairments that meet the equivalent of a listed impairment, there can nonetheless be a finding of disability. Such a finding is triggered by the ALJ's assessment at step four, through a determination of the claimant's residual functional capacity ["RFC"].

In the instant matter, the ALJ did assess Daughtry's RFC and found that the claimant had the ability to perform "medium" work (R. 25). Furthermore, she can return to all past relevant work, except work as a sewing machine operator (R. 25). Daughtry disagrees, and contends that the ALJ erred as follows:

1. The ALJ erred when giving a non-examining medical advisor's opinion

more weight than that of examining sources (Doc. # 10, pp. 4–7). As a result, he did not properly consider all of Daughtry's severe impairments (Doc. # 10, pp. 13–14).

2. The ALJ did not properly develop the claim for disability benefits, particularly when evaluating her impairments (Doc. # 10, pp. 7–9).

3. The ALJ did not properly consider Daughtry's subjective complaints of pain (Doc. # 10, pp. 11–13).

In response, the Commissioner argues that substantial evidence supports her decision (Doc. # 11, p. 8). For the reasons set forth herein, the Court agrees with the Commissioner.

### D. Analysis of Evidence

#### 1. Daughtry's Complaint

The gravamen of Daughtry's complaint is as follows:

The ALJ denied Mrs. Daughtry's claim because he determined that she could perform medium work. (R. 27). Further, the ALJ determined that the Plaintiff could return to her past relevant work. (R. 27). To make this determination, the ALJ failed to properly consider Ms. Daughtry's testimony concerning chronic severe pain resulting from fibromyalgia ... He improperly discounted the medical opinion of the Plaintiff's treating physician, Dr. Joanne Smith, concerning the Plaintiff's pain but instead relied upon a gynecologist's medical opinion. The ALJ's decision is not supported by substantial evidence contained in the Plaintiff's file.

(Doc. # 10, p. 2).

#### 2. Analysis of the Alleged Errors

*a. Weight Given to Physician Testimony*

According to Daughtry

The ALJ ignored [Dr. Vyas'] medical opinion. The ALJ instead chose to rely on Michael A. Wells, M.D., who is a gynecologist. In addition, Dr. Wells did not see the Plaintiff after her November 20, 2000 visit. Yet the ALJ discounted Dr. Joanne Smith and even the State Agency examiner Dr. Vyas' opinion and instead relied upon a gynecologist when determining the plaintiff's residual functional capacity. (R. 301). The ALJ failed to properly consider Dr. Smith's and Dr. Vyas' medical opinion.

(Doc. # 10, p. 5).

"The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997) (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Phillips v. Barnhart*, 357 F.3d 1232 (11th Cir.2004)).

The Commissioner's regulations also recommend a similar preference for the opinions of treating doctors.

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

20 CFR § 404.1527(d)(2).

The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error. *MacGregor*, 786 F.2d at 1053. "Good

cause" exists where the doctor's opinion was not bolstered by the evidence, or **where the evidence supported a contrary finding**. See *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir.1987); *Sharfarz v. Bowen*, 825 F.2d 278, 280–81 (11th Cir.1987). Good cause also exists where the doctors' opinions were conclusory or inconsistent with their own medical records. See *Jones v. Department of Health & Human Services*, 941 F.2d 1529, 1532–33 (11th Cir. 1991); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.1991).

■ Dr. Smith was Daughtry's treating physician. Although ALJ minimized the emphasis he placed on Dr. Smith's opinion, he went to painstaking lengths to establish that "good cause" exists for doing so. The main reason for the ALJ's relative disregard for the treating physician's opinion is "there is no objective medical evidence to support the conclusion that [fibromyalgia] entailed significant work-related limitations for a continuous period of twelve months during the relevant time under consideration" (R. 17).

Treatment records from the claimant's primary treating physician, Joanne Smith, D.O., first document a diagnosis of "fibromyalgia" in May, 1998 ... However, a review of that treatment note, as well as subsequent notes of office visits from August, 1998 through February, 2000 reveals that on only four occasions does the assessment of "fibromyalgia" appear in the records. Furthermore, **on the few occasions that [fibromyalgia] does appear in the treatment records, there are no positive clinical examination findings such as joint swelling, muscle spasm, tenderness, or other signs or symptoms to substantiate the diagnosis.** The three most significant records relating to the claimant's alleged fibromyalgia are Dr. Smith's March 6, 2000, July 5, 2000, and September 1, 2000 treatment notes ... The record documents that the claimant **denied ... myalgia** ... The record indicates that the claimant returned to Dr. Smith's clinic in May, 2000, to be evaluated for a "painful lump behind her right ear," and the diagnosis of "fibromyalgia" appears under the section of the treatment record entitled "Assessment." However, it appears that Dr. Smith did not see the claimant on this occasion, rather she was seen by a certified registered nurse practitioner in Dr. Smith's office. Moreover, under the section of the report entitled "Objective," **the nurse practitioner reported that the claimant had equal grip strength in both hands and that, although the claimant reported chronic lower back and bilateral knee pain, *no* clubbing, cyanosis, edema, joint changes, muscle atrophy, or muscle spasm were detected.** It appears to the undersigned that the assessment of "fibromyalgia" appears in this particular treatment note because the claimant reported to the nurse practitioner taking the claimant's history that she had previously been diagnosed with fibromyalgia.

(Emphasis added)(R. 18).

The ALJ's analysis meets the "good cause" requirement. That the record was devoid of clinical findings which support Dr. Smith's conclusions is a significantly diminishing factor. When combined with the fact that Daughtry was actually "assessed" by a nurse practitioner, rather than Dr. Smith herself, on the second examination, it was not unreasonable for the ALJ to give less weight to Dr. Smith's medical opinion. His articulation of his reasons established "good cause" for failing to give precedence to the treating physician's opinion.

In addition to the absence of objective evidence of fibromyalgia in Daughtry, the

ALJ's analysis identified additional "good cause" for not including fibromyalgia as a severe impairment. The record also supported the ALJ's inability to conclude that the condition would continue for more than twelve months and his refusal to make a definite finding based on the use of the word "probably" in the diagnosis, rather than a definite determination that Daughtry suffers from fibromyalgia.[2]

In her brief to the court, Daughtry also contends that the ALJ did not properly consider the medical opinion of Dr. Vyas, a consulting agency physician. However, in her discussion of the relevance of Dr. Vyas' opinion, Daughtry acknowledges that Dr. Vyas concluded that she suffered from "[f]ibromyalgia **by history**" (Doc. # 10, p. 5 citing to R. 351). Although Dr. Vyas further noted that "[t]he patient has very significant tenderness on the right sacroillitic joint on deep palpation" (R. 350), that statement alone or that statement combined with any of her other findings, is insufficient to compromise the ALJ's determination.

This is true because the term "by history", as used by Dr. Vyas, is a reference to Dr. Smith's medical records—records which the ALJ had previously analyzed and deemed inconsistent with underlying objective medical evidence. Indeed, if Dr. Smith's opinions are unsupported by the weight of the objective medical evidence, and Dr. Vyas' opinion is hoisted upon the former, then both opinions should be deemed inconsistent with the weight of the objective medical evidence. For those reasons, the court finds that the ALJ showed "good cause" for not according substantial weight to Dr. Smith's opinion.

### b. Daughtry's Subjective Allegations of Pain

 Daughtry also contends that the ALJ did not properly accredit her subjective allegations of pain from fibromyalgia. As a matter of law, "[t]he Secretary must consider a claimant's subjective testimony of pain if [ ]he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater,*

2. The ALJ advises that

An impairment is severe within the meaning of the Regulations if it has lasted or can be expected to last for a continuous period of not less than twelve months and it imposes significant limitations on an individual's physical or mental abilities to perform basic work activities. A thorough review of the medical evidence contained in the record establishes that the claimant's fibromyalgia is not a condition that has been continuous for a period of twelve months. As indicated by the above analysis of the claimant's treatment history for her alleged condition, the first continuous reference to fibromyalgia, including symptomatic complaints thereof, began in February, 2001 and there is no credible opinion from the claimant's treating physician that this condition has existed for twelve continuous months or that it is expected to continue for twelve continuous months. The undersigned notes that in the recent narrative report from Dr. Smith dated August 6, 2001, she stated that "[d]ue to the negative rheumatoid arthritis and ANA, mildly elevated CRP, and normal sed rate, we do feel that the [claimant's] diagnosis of fibromyalgia is **probably** correct due to the fact that no other connective tissue has [been] obtained on lab work." (Exhibit 17F) In other words, Dr. Smith has decided to label the claimant's vague and sporadic complaints as "fibromyalgia" even though there is virtually no clinical examination findings or objective laboratory test data to substantiate such a diagnosis and because there is no evidence of any other type of connective tissue disorder. Such reasoning is illogical and at best appears to have been served up by the doctor to placate the claimant.

(R. 19).

67 F.3d 1553, 1560 (11th Cir.1995) (citations omitted). The Court of Appeals has stated further:

> After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence. *Wilson v. Heckler,* 734 F.2d 513, 517 (11th Cir.1984). If the ALJ refused to credit subjective pain testimony where such testimony is critical, he must articulate specific reasons for questioning the claimant's credibility. *Walker v. Bowen,* 826 F.2d 996, 1004 (11th Cir. 1987).

*Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir.1992) (citations omitted). The analytical framework in *Foote* is comprised of a two-pronged test for determining whether the ALJ must accord credence to a claimant's subjective allegations of pain. First, the ALJ must find evidence of the alleged underlying medical condition. And second, if and only if he does find objective evidence of the alleged underlying condition, he must determine whether the condition is so severe that it can reasonably be expected to give rise to the alleged pain.

The analysis here ends at the first prong because, as discussed, *infra,* the ALJ did not find objective medical evidence to support the existence of the alleged medical condition.[3] As a result, Daughtry's claim that the ALJ did not give proper credence to her subjective allegations of pain is also in error.

### c. Daughtry's RFC Determination

■ The ALJ's conclusion that Daughtry can perform "medium work" appears to be based upon the fact that fibromyalgia and a chemical imbalance were not included in the medical impairments assessment. Specifically, Daughtry complains that

> The ALJ cannot decide whether a claimant can perform substantial gainful activity without properly assessing the claimant's RFC. Dr. Wells treated the Plaintiff for abdominal pain in the right lower quadrant. Her medical illnesses were noted in these medical records to be chemical imbalance and fibromyalgia, but Dr. Wells never included these medical impairments in his assessment.

(Doc. # 10, p. 9).

Contrary to the implication of Daughtry's claim, however, the ALJ referenced psychological issues[4] in his ALJ's hypo-

---

3. In addition to assigning physical restrictions to the claimant for which there is essentially no evidentiary basis, Dr. Smith also opined that the claimant's fibromyalgia had "existed and persisted with the restrictions as outlined in the Medical Source Statement" since at least August 2000. The problem with Dr. Smith's opinion that the claimant's condition has persisted since August, 2000 is that she did not see the claimant in August 2000 and, when she did see the claimant in July, 2000 and when the claimant was seen by the nurse practitioner in September, 2000, there is no assessment of fibromyalgia and the claimant made no symptomatic complaints supportive of such a diagnosis. Furthermore, after the September, 2000 visit, the claimant did not return to Dr. Smith for treatment for five months. Therefore, the undersigned finds that there is substantial evidence to question the doctor's credibility and the accuracy of the period of restriction noted in the medical source opinion statement ant that the use of August, 2000 as the date of inception of the claimant's fibromyalgia is completely incredible, arbitrary, and it appears to be related solely to the claimant's alleged onset date for purposes of her disability claim. (R. 19–20).

4. Q ... I mention this because there was a claim for fibromyalgia, and with all these specific things denied, I think it's important to notice that neurologically she denied a loss of consciousness, memory loss, disorientation, dizziness, emotional disturbances, clumsiness, difficulties with balance, tremors, paralysis, prosthesia, seizures, articulation problems, drug or alcohol dependency. Those were the observations of the treating physician as of

thetical to the vocational expert ["VE"](R.88). As a result, the court concludes that the purported chemical imbalance was included for purposes of making an RFC determination. Furthermore, based on the previous analysis, *infra*, the ALJ properly excluded fibromyalgia in his hypothetical to the VE.

In consideration of all of the information and analysis contained herein, the court concludes that the decision of the Commissioner should be affirmed.

## IV. CONCLUSION

Therefore, it is hereby ORDERED that the decision of the Commissioner is AFFIRMED.

April of the following year. And upon examination, psychologically, she was given—do you have it?

A I have a copy of it right here.

Q And her (INAUDIBLE) level was within normal limits. She was noted for taking Prozac. She's receiving appropriate medical services, taking the proper medications for it . . . Leisure skills, says that she reads, watches satellite TV, has a poodle and a bulldog, and she socializes, which would pretty much conform to everything that we have heard. She meets the criteria for (INAUDIBLE) dependence anxiety disorder NOS and dysthymia. Examiner felt she reports health problems with dysthymia with an uncausation, receiving medication. (R. 88–89).