**Althea W. McCANTS, Plaintiff,**

v.

**Michael J. ASTRUE,[1] Commissioner of Social Security, Defendant.**

**Civil Action No. 05–00653–B.**

United States District Court,
S.D. Alabama,
Southern Division.

March 29, 2007.

---

**1.** On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the *Federal Rules of Civil Procedure,* he has been substituted as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Gilbert B. Laden, Mobile, AL, for Plaintiff.

Patricia Nicole Beyer, U.S. Attorney's Office, Mobile, AL, for Defendant.

## ORDER

BIVINS, United States Magistrate Judge.

Plaintiff Althea W. McCants ("Plaintiff") brings this action seeking judicial review of the final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.* The parties consented to have the undersigned conduct any and all proceeding in this case; accordingly, the case was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. (Docs.11, 12). Upon consideration of the administrative record and memoranda of the parties, it is hereby ordered the decision of the Commissioner be **REVERSED** and **REMANDED**.

### I. *Procedural History*

Plaintiff protectively filed an application for disability benefits on January 10, 2003, alleging disability since November 26, 2002, due to a bilateral disorder/osteoarthritis in her knees. (Tr. 16–17, 119–122, 136, 138, 140, 142, 296). Plaintiff's application was denied upon initial review and upon reconsideration. (*Id.* at 102–108). She then filed a request for a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 109). On July 1, 2003, ALJ R.G. Goosens ("ALJ Goosens") held an administrative hearing which was attended by Plaintiff and her representative. (*Id.* at 40–75, 286–325). A second hearing was held on November 19, 2003 after the procurement of neurological and orthopaedic consultative examinations, which were ordered by the ALJ. (*Id.* at 76–91, 326–344). Plaintiff, her representative and James D. Miller ("VE Miller"), a vocational expert, attended the hearing. (*Id.*) On September 24, 2004, ALJ Goosens issued an unfavorable decision, in which he concluded that Plaintiff cannot perform her past relevant work ("PRW") but retains the residual functional capacity ("RFC") to perform a wide range of sedentary exertional work. (Tr. 13–38). Plaintiff sought

review of the ALJ's decision; however, the Appeals Council ("AC") denied her request. (*Id.* at 5–7). Thus, the ALJ's decision became the final decision of the Commissioner. (*Id.*) The parties waived oral argument and agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. *Background Facts*

Plaintiff was born on October 13, 1955, and was 47 years old at the time of the second administrative hearing. (Tr. 17, 102, 120, 289, 332). Plaintiff has a high school education and a B.S. degree in Library Media. (*Id.* at 17, 143, 148). She has PRW as a library media specialist,[2] library assistant and cashier. (*Id.* at 142–144, 148, 186, 289, 292–296). Plaintiff testified that she has bilateral knee disorders that cause her pain and swelling. (*Id.* at 296–299, 330). According to Plaintiff, she suffered a fall in November 2002, after slipping on a wet floor. (*Id.* at 296–297). She has received treatment from Dr. Hudgens (including cortisone shots, 5 weeks of Synvisc injections, medication and physical therapy), and has undergone surgery. (*Id.* at 296–299, 301–308, 313–314, 316, 318–321). Plaintiff indicated that while she has problems with both knees, she has more problems with her left knee. (Tr. 296–297). Plaintiff testified that she uses a cane whenever she stands or walks, and sometimes when rising from a sitting position to pull herself up to stand. (*Id.* at 299, 308–309, 316–317).

Plaintiff reported that she cares for her own personal needs with effort and occasional assistance, performs only limited household cleaning and chores, prepares meals occasionally, reads, has a driver's license and occasionally drives, grocery shops with assistance (and sometimes has to ride a cart while doing so), attends church services occasionally, and visits others infrequently. (*Id.* at 291, 308–313, 318). According to Plaintiff, she spends her days sitting with her legs elevated and reads or watches television. (*Id.* at 303–304, 308). Plaintiff testified that she can sit for 20–30 minutes at one time before having to change positions and for 2–3 hours per 8 hour work day, and can stand or walk for 20–30 minutes each at one time and for about 2 hours each per 8 hour work day. (*Id.* at 315–316).

Plaintiff's reported medications include Lortab, Darvocet, Bextra, Ambien, Glucosamine/Chondroitin, Propoxy, Centrum Silver Vitamins, Coral Calcium, Cortisone shots, Tylenol Arthritis, Aleve, Jointritis and Arthritis Hot. (*Id.* at 147, 158–159, 169, 184–185, 187–188, 303–307, 313–314). According to Plaintiff, she takes the Lortab 2–3 times per month only "as a last resort" because it makes her very drowsy and nauseous, even though it alleviates the pain some. (Tr. 303–306, 313–314). She also reported that she takes Darvocet 3–4 times per week for severe pain; however, it too makes her sleepy. (*Id.*)

## III. *Issues on Appeal*

A. Whether the ALJ erred by discounting the opinion of Plaintiff's treating physician?

B. Whether the ALJ erred by failing to properly consider her credibility and subjective complaints of pain?

## IV. *Analysis*

### A. *Standard of Review*

In reviewing claims brought under the Act, this Court's role is a limited one.

---

**2.** Plaintiff was awarded disability retirement benefits from her employer effective March 1, 2003. (Tr. 134).

This Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990).[3] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir.1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. *Brown v. Sullivan*, 921 F.2d 1233, 1235 (11th Cir.1991); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir.1986); *Short v. Apfel*, 1999 U.S. DIST. LEXIS 10163 (S.D.Ala.1999).

## B. *Discussion*

An individual who applies for Social Security disability benefits must prove her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[4] *See, e.g., Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir.1997).

In the case *sub judice*, the ALJ determined that while Plaintiff has the severe impairment of status post patellofemoral chondroplasty/bilateral arthritis of the knees, she does not have an impairment or combination of impairments which meets or equals one of the Listings. (Tr. 37). The ALJ found that Plaintiff retains the residual functional capacity ("RFC") for

---

**3.** This Court's review of the Commissioner's application of legal principles is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

**4.** The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir.1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. *Id.* at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. *Sryock v. Heckler*, 764 F.2d 834 (11th Cir.1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir.1999). *See also Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir.1987) (citing *Francis v. Heckler*, 749 F.2d 1562, 1564 (11th Cir.1985)).

sedentary[5] work with the following additional nonexertional environmental and postural restrictions: occasional bending, squatting, crawling and climbing; frequent reaching; occasional driving of automotive equipment; occasional exposure to extreme temperature changes, wetness/humidity and vibration; occasional exposure to moving mechanical parts; no work around unprotected heights or exposure to fumes, noxious odors, dust, mists, gases or poor ventilation; moderate limitations working around moving machinery; and mild limitations on her ability to drive. (*Id.*) The ALJ concluded, in light of the VE testimony and other evidence, that while Plaintiff cannot perform her past relevant work ("PRW"), under Rule 201.22 of the *Medical Vocational Guidelines,* there exist a significant number of jobs in the national economy that she can perform given her particular limitations. (*Id.* at 37–38). Thus, he found that she is not disabled. (*Id.* at 38). In reaching his decision, the ALJ rejected the opinions of Plaintiff's treating physician, Dr. Hudgens.

Based upon a review of the record, the undersigned finds that the ALJ's decision is not supported by substantial evidence. Relevant medical records reveal that Plaintiff was seen at Mobile Open MRI for right knee pain on January 16, 2001, for a MR scan of her right knee; she was assessed with osteochondritis dissecans involving the anteromedial portion of the lateral femoral condyle, apparent bone bruise involving the medial femoral condyle, very questionable tear of the posterior horn of the medical meniscus, small subchondral cyst located just causally to the medial tibial spine, thinning of the lateral articular cartilage of the patella consistent with chondromalacia, and a slight lateral deviation of the patella, and a small joint effusion. (Tr. 189).

From June 15, 2002 through August 5, 2002, Plaintiff underwent rehabilitative therapy (including range of motion ("ROM"), strengthening, gait training, symptom management, Nautilus exercises, etc.) at Providence Hospital (15 sessions). (*Id.* at 199–230). At the start of her therapy in June 2002, Plaintiff reported pain, loss of ROM, weakness, swelling, difficulty walking, and knees "locking" up when walking. (*Id.* at 225). Her initial assessment included having an abnormal and altered gait, joint pain, muscle wasting, disuse atrophy, osteoarthritis/arthritis, limb swelling, bilateral knee pain, decreased ROM, decreased strength, decreased activities of daily living ("ADL") function, assisted straight leg raising ("SLR") and buckling of her left knee. (*Id.* at 226). Notes from her last session on July 24, 2002 reveal that her pain was at a level "1" on the 1–10 pain scale and she was "still good." (*Id.* at 200). It was also noted that she had met all goals, made steady progress and no longer required taping for symptom management. (*Id.*) Plaintiff's August 5, 2002 discharge record reflected that she had achieved all of her goals, and that she was to follow-up with her physician and continue on the exercise program. (Tr. 199).

Plaintiff was treated by orthopedic surgeon Russell A. Hudgens, M.D. ("Dr. Hudgens") from 2001 through 2003 as follows (*Id.* at 192–198, 239–261, 273–279):

- *January 16, 2001:* Dr. Hudgens noted that Plaintiff complained of right knee pain. She had bilateral patellar crepitus but no pain in her left knee. She reported that she has had this for 6–8

---

5. Sedentary work involves sitting for approximately 6 hours in an 8 hour work day, walking and standing for approximately 2 hours in an 8 hour work day, and lifting no more than 10 pounds at a time. 20 C.F.R. § 404.1567(a); SSR 83–10, 1983 WL 31251 (S.S.A.).

months with no history of any injury or trauma. Her right knee popped when she twisted or turned. Dr. Hudgens noted that she had minimal swelling and an occasional locking of her right knee only. She had temporary relief from Naproxen but no longer has relief and recently tried Celebrex but did not note any relief. Her physical exam revealed that she had significant bilateral patellofemoral crepitus with no angular deformities to her knee; minimal swelling or puffiness to her right versus her left knee; no specific point tenderness; minimal pain on grind testing on the right and negative on the left; positive medial McMurray's; and no popping. Plaintiff's x-rays from August 2000 revealed mild patellofemoral arthrosis, otherwise appropriate for her age. Dr. Hudgens assessed Plaintiff with bilateral patellofemoral arthrosis and a possible medial meniscus tear in her right knee. His plan was to try her on Vioxx in place of Celebrex and he discussed a quad strengthening program with Plaintiff. He stated that he would proceed with MRI scanning of her right knee due to the fact of continued mechanical symptoms in her knee on the right side, and that she would report back after that was performed.

- *January 23, 2001:* Plaintiff returned to review the MRI scan of her right knee which revealed that she had osteochondritis in her lateral femoral condyle which appeared to have a normal cartilage covering, a small cyst in her tibial spine, mild fusion and questionable meniscal pathology. Dr. Hudgens felt that her meninscus were most likely normal, but he noted that she had some mild patella femoral cartilage wear which was mainly her creptius that she was feeling. He stated that most of her pain was possibly coming from the patella femoral arthrosis as well as the osteochondritis of lateral femoral condyle. Dr. Hudgens referred her to physical therapy for a quad strengthening program and told her to continue on Vioxx and to check in with him in a few weeks to see how she was doing.

- *February 13, 2001:* Dr. Hudgens noted that Plaintiff was doing much better—approximately 75–80% better. He noted that her knee still had patellofemoral creptius but that she had minimal pain. He told her to continue taking Glucosamine and Vioxx, adding that if she did not improve, she check back at that time.

- *June 19, 2001:* Plaintiff reported that she was having more problems with her knees—bilateral crepitance. She also reported having had more pain on the right than on the left, but more effusion with her left knee. Dr. Hudgens noted that she had not had any long term relief so far with any of the medications. His plan was to inject her knees with Depo–Medrol and Lidocaine and for her to continue with strengthening; and he also discussed surgical alternatives with debridement of both knees if necessary.

- *February 19, 2002:* Plaintiff reported bilateral knee pain. She had 3–4 months of relief after her last injection. Dr. Hudgens noted that the same pain appeared to be in the patella femoral area with no significant crepitance on ROM. Minimal synovitis was noted. Dr. Hudgens talked with her about options (injection, therapy of various kinds, arthroscopic debridement and/or just living with it). He stated that he thought she would do best, at that time, with repeating an injection since she had fairly good results from that but added that if she

did not get good results, an arthroscopic chondroplasty may be considered.

- *May 16, 2002:* Dr. Hudgens noted that Plaintiff was still having trouble with her knees. She was very slow getting out of the chair. She had tenderness located in the anterior portion of both knees, more on medial aspect of each knee, and mild synovitis present in both her knees. Dr. Hudgens recommended an arthroscopy of both knees with possible chondroplasty, and an evaluation of the cysts noted in the femoral condyle on the prior MRI scan of her right knee.

- *June 3–4, 2002:* Due to Plaintiff's complaints of bilateral knee pain, she underwent a bilateral knee arthroscopy with patellofemoral chondroplasty of both knees. She reported occasionally catching/popping in her knees with the right knee somewhat worse than the left with swelling. Naprosyn and Celebrex offered mild temporary relief but not provide complete relief. It was becoming increasingly difficult for her to get around due to knee pain. She has tried injections with no significant relief. She uses a cane to assist with ambulation. She was assessed with osteochondritis dissecans knees with possible medial meniscus tear bilaterally. Dr. Hudgens found that she had Grade II–III articular cartilage changes and significant wear in both knees; he also documented her history of persistent pain in both knees with decreasing ability to ambulate secondary to pain.

- *June 10, 2002:* Plaintiff was 1 week status post bilateral arthroscopies. Dr. Hudgens noted that she had improved fairly well and that her incision appeared to be healing well. He noted that she had a ROM in both knees from 10 to 130 degrees, with no sign of calf tenderness. She did have moderate swelling within her knees themselves and she was getting around with just a cane. Dr. Hudgens referred her to physical therapy, where she had previously been for strengthening of her lower extremities, and told her to follow-up in 10 days to 2 weeks.

- *June 24, 2002:* Plaintiff was 3 weeks status post bilateral arthroscopy. Dr. Hudgens noted that she was improving well as far as her strength, but she still had significant patellofemoral crepitus on ROM, left more than right, with slight effusion present. She also had minimal increased warmth. Dr. Hudgens noted that she was improving with physical therapy and strengthening and would continue that for the next 2 weeks and then follow-up with him at that time.

- *July 9, 2002:* Dr. Hudgens noted that Plaintiff was 5 weeks status post bilateral arthroscopy. He found that her right knee was better but her left knee was worse (more clicking/popping). He noted that she was responding to physical therapy; however, he was not certain why she was not getting the relief she had initially had for her left knee, adding that she still had a pretty antalgic gait and was using a cane to walk. His plan was to continue her on therapy for 2 more weeks and then consider if she could return to work.

- *July 25, 2002:* Plaintiff was doing much better and was able to walk without significant pain or problems. She reported being fairly comfortable and that she felt like she could resume her regular work activity. She felt that she was walking fairly fluidly without much difficulty. Dr. Hudgens noted that she reported mild discomfort when she got in or out of a chair.

He recommended that she avoid a lot of bending and stooping and kneeling with knees, and that she continue with her quad strengthening program and walking. He concluded that she was to resume regular work activity, but should check back with him in one month if she was having any problems.

- *August 13, 2002:* Plaintiff was not doing quite as well as she had been at the last visit. She reported that she still had a good bit of stiffness in her left knee with an occasional popping sensation and moderate swelling at times. Dr. Hudgens noted that she was still using a walking cane but had returned to work, which she reported that she could "comfortably do with self imposed restrictions." Her exam revealed that she had minimal synovitis but no restriction of motion, and mild tenderness across medial joint line of both her knees. Dr. Hudgens placed her on Bextra and noted that she would try to continue to limit herself as she had been doing.

- *December 4, 2002:* Plaintiff suffered a slip-and-fall injury at work in November, and reported that she had twisted her knees and injured her right foot and lower back and had increasing pain in her knees with crunching/grinding and swelling. Dr. Hudgens noted that she was using a walking cane to get down and mild effusion was present in both her knees with significant patella femoral creptiance. He noted no ROM restriction and no sign of any instability to her knee. He assessed her with osteoarthritis in both knees with acute exacerbation. Dr. Hudgens renewed her Bextra, provided her with Darvocet as needed for pain, and told her to hold off from working and to follow-up in 2–3 weeks. Dr. Hudgens suspected that the previous arthroscopic evaluation of both knees and microfracture treatment of osteochondral lesions have been aggravated, and would take 4–6 weeks to resolve back to normal. He also completed a form in which he concluded that Plaintiff was unable to return to work until January 6, 2003.

- *December 19, 2002:* Dr. Hudgens noted that Plaintiff still had a fair amount of crepitance, particularly in her left knee. Her pain had eased a little bit but she still had a fair amount of swelling. She had notable crepitance and grinding on both knees when she ambulated as well on with flexion of her knees. She was using a cane to ambulate. Mild effusion was noted as present in both her knees. Dr. Hudgens recommended that she hold off from working until a follow-up appointment on January 13th; that she avoid bending, squatting and stooping; and that she continue her home exercises and taking Bextra. He also completed a form in which he concluded that Plaintiff was unable to return to work until January 11, 2003.

- *January 10, 2003:* Plaintiff was overall about the same—she was still having a significant amount of pain and swelling in her left knee which was greater than right knee with audible and palpable patella femoral crepitance with associated effusions in both knees with slight increased warmth. He assessed her with osteoarthritis in both knees, and discussed treatment options. Dr. Hudgens noted that she had some relief with injection therapy, and so he planned to inject her knees with Depo–Medrol, Lidocaine and Marcaine that day. He added that: "I do not feel that she is going to be able to resume her regular activity and at this time she will consider long term disability of this." Dr. Hudgens also filled out a prescription which stated

that Plaintiff was "[u]nable to work at this time & indefinitely."

- *January 23, 2003:* In a Physician's Report of Disability for the Retirement Systems of Alabama, Dr. Hudgens detailed his treatment of Plaintiff since January 16, 2001 as well as her complaints of pain, swelling and being unable to walk/stand for more than 10–15 minutes. He noted the objective findings of significant crepitus, swelling and effusion in both of her knees. He confirmed Plaintiff's diagnoses of osteoarthritis, bilateral knees, and assessed her prognosis as "fair." Dr. Hudgens opined that Plaintiff was totally incapacitated, was likely to be incapacitated permanently, and that she should be retired.

- *February 10, 2003:* Plaintiff was getting around a little bit better, had less fluid/swelling with knee but still had moderate to severe patellar creptius on any motion of her knee. Dr. Hudgens noted that she was fairly comfortable with Bextra and Darvocet.

- *March 3, 2003:* Plaintiff complained of severe knee pain bilaterally, greater on the right. Her exam revealed that she had moderate swelling in both knees with tenderness across both medial joint lines in the patellofemoral area with moderate crepitus. Dr. Hudgens' plan was to inject her knees with Depo–Medrol, Lidocaine and Marcaine, and she was given Lortab for pain.

- *March 19, 2003:* Dr. Hudgens completed a Medical Source Statement in which he concluded that Plaintiff had not been capable of performing sustained sedentary work on a regular and continuing basis (8 hours per day, 5 days per week or an equivalent work schedule). He indicated that she experienced symptoms to such an extent as to be distracting to the adequate performance of daily activities/work; that physical activity (walking, standing, sitting, bending, stooping, moving of extremities, etc.), increased the degree of symptoms experienced to such an extent that bedrest was necessary; and that medication side effects could be expected to be severe and limit her effectiveness due to distraction, inattention, drowsiness, etc. Also, Dr. Hudgens opined that she needed a job which permitted shifting positions at will, from sitting, standing or walking. He noted that while engaged in occasional standing/walking, she had to use a cane or other assistive device. Dr. Hudgens concluded that she was able to occasionally climb and reach, but could never bend, squat or crawl. He determined that she had an extreme limitation of her ability to walk, but did not need to lie down/recline during the day and that her impairments were likely to produce good days and bad days. He documented the earliest date of her described level of symptoms and limitations as January 1, 2001.

- *April 3, 2003:* Dr. Hudgens prescribed a cane to Plaintiff "for use" "when needed."

- *May 30, 2003:* Plaintiff reported that she was still having problems with pain in her knees and crepitus. Dr. Hudgens noted that she was still using a walking cane and taking Bextra. She had not had any long term relief from her last injections. Dr. Hudgens discussed the need to continue taking Glucosamine and to consider Synvisc injections, which she would think about having, and he also renewed her Darvocet for pain. He noted that she would check back with him accordingly.

• *June 11, 2003:* Dr. Hudgens wrote a letter to Plaintiff's counsel, in which he noted Plaintiff's knee problems had not improved but had actually worsened; she had significant grinding/crunching sounds within her knees which required her to use a walking cane; and she had not had long term relief or significant relief from any medications with the exception of an occasional injection into her knees. He stated that he did not believe that her problems would resolve or improve: "I feel strongly in stating that her disability and impairment will last longer than twelve (12) months from the date of 11/25/02 and most likely will extended until she ends up having to get her knees replaced. Even at that point, she still will most likely be unable to be gainfully employed."

• *July 1, 2003:* A treatment note revealed that Plaintiff was taking Lortab, Bextra, Darvocet, Ambien, Glucosamine/Chondroitin and a vitamin, as well as using Jointritis cream and Arthritis Hot.

• *October 7–November 6, 2003:* Plaintiff received five Synvisc knee injections. Dr. Hudgens advised her to let him know if she was still having significant problems and he would then consider MRI scans.

On December 20, 2003, Plaintiff underwent an MRI of her right knee, which revealed that she had osteoarthritis changes with an anterior medial femoral condyle spur impinging on the medial meniscus; no meniscal tear was identified; and no residual abnormality was seen at the site of the previously described osteochondritis dissecans in the lateral femoral condyle. (*Id.* at 278). The MRI of her left knee revealed moderate changes of osteorarthritis, noted to be slightly more advanced in the left knee than in the right knee; a vertical radial tear of the posterior horn of the medial meniscus; a popliteal cyst; and a ganglion cyst in the tibia at the insertion of the anterior cruciate ligament. (*Id.* at 279).

On April 6, 2004, Plaintiff was seen by Dr. Hudgens, at which time she experienced severe pain with severe patellofemoral crepitus on exam mild effusion present. (*Id.* at 277). Plaintiff elected to wait on having another injection, and so was advised to continue taking her anti-inflammatory and pain medication and to follow-up with Dr. Hudgens as needed. (*Id.*) Dr. Hudgens opined that "[s]he remains unable to work." (Tr. 277).

On August 2, 2003, at the State Agency's request, Plaintiff was examined by consultative neurologist Ilyas A. Shaikh, M.D. ("Dr.Shaikh"). (*Id.* at 262–265). Her physical examination revealed no edema of the lower extremities; crepitations at both her knees, left more than right; reduced knee ROM bilaterally (100 instead of 150); somewhat limited ROM with the dorsolumbar spine; mildly abnormal lower extremity muscle strength bilaterally; movement of all four extremities; normal sensation; normal deep tendon reflexes throughout; ability to walk without a cane but had an unstable tandem gait; and she was unable to squat and touch her fingers to her toes or stand on her heels and toes. (*Id.*) Dr. Shaikh found that she had moderate to severe deficits at her knees and dorsolumbar spine, and a mild ROM deficit. (*Id.* at 264). Dr. Shaikh diagnosed Plaintiff with bilateral knee osteoarthritis, and noted her history of degenerative disease in her knees and that she continued to suffer from knee pain despite arthroplastic intervention. (*Id.*) He concluded that based on her history and exam, she may have difficulty performing work-related activities that require active bending, walking, lifting, carrying, or stooping, due to the severity of her osteoarthritis; may be

dependent on a walking cane or similar support to avoid pain or a fall; and may eventually require a total knee replacement. (*Id.*)

Dr. Shaikh also completed a Medical Source Opinion (Physical) Form on August 2, 2003, in which he noted that his findings were not based on Plaintiff's subjective complaints. (Tr. 266–268). Dr. Shaikh—citing knee osteoarthritis as the clinical finding substantiating his opinion—concluded that Plaintiff retains the following physical RFC to:

- lift 5 pounds constantly, 30 pounds occasionally and 20 pounds frequently;
- carry 5 pounds constantly, 10 pounds frequently and 20 pounds occasionally;
- stand for 30 minutes at one time and for 4 hours total per 8 hour work day;
- walk for 15 minutes at one time and for 2 hours total per 8 hour work day;
- sit for 4 hours at one time and for 6 hours total per 8 hour work day;
- constantly handle, finger, feel, talk and hear;
- frequently use both arms for push/pull activities and for reaching overhead;
- occasionally climb, balance, crawl, drive automotive equipment and work around temperature extremes, wetness/humidity/vibration and in proximity to moving mechanical parts; and
- never perform work involving pushing/pulling with her legs, stooping, kneeling or crouching, working around exposure to fumes, noxious odors, dust, mists, gases or poor ventilation, and working in high, exposed places.

(*Id.*)

On September 2, 2003, at the State Agency's request, Plaintiff was examined by consultative orthopedist Andre J. Fontana, M.D. ("Dr.Fontana"). (*Id.* at 269–271). Her physical exam revealed as follows: a fair to poor heel-toe gait; a poor toe-heel gait; severe left knee crepitus; moderate right knee crepitus; minimal effusion; significant popping with ambulation; a poor ability to squat; normal deep tendon reflexes; SLR 90 degrees sitting, supine was to 60 on the right and 70 on the left; normal sensory functioning; and equal calf measurements. (*Id.* at 270). Her knee x-rays revealed that she had some intercondylar spurring and minimal spurring both medially and laterally on the tibial plateau; lateral knee views revealed some spurring under the patella of her right knee; and her left knee demonstrated spurring under the patella both superiorly and inferiorly as well as what appeared to be small osteophytes in the anterior and posterior aspect tibial plateau. (*Id.*) Dr. Fontana diagnosed Plaintiff with left and right knee traumatic arthritis. (*Id.*) He concluded that she was limited to light to minimal walking activities and no climbing or prolonged periods of standing. (Tr. 270). Dr. Fontana also completed a Physical Capacities Evaluation, in which he concluded that Plaintiff has the ability to sit, stand or walk, each, for 1 hour at a time; sit for 6–8 hours total per 8 hour work day; stand or walk for 3–4 hours total per 8 hour work day; lift up to 10 pounds continuously, up to 25 pounds frequently and up to 50 pounds occasionally; carry up to 5 pounds continuously, up to 20 pounds frequently and up to 25 pounds occasionally; use her right and left hands and feet for repetitive action and movements; occasionally bend, squat, crawl and climb; frequently reach; perform work entailing exposure to dust, fumes, gases and marked changes in temperature or humidity; but has mild restrictions from activities involving driving automotive equipment, a moderate restriction from activities involving exposure to moving machinery, and a total restriction from activities involving exposure to unprotected heights. (*Id.* at 272). Dr. Fontana concluded that Plaintiff is "limit-

ed to light to minimal walking activities." (*Id.*)

As noted *supra*, Plaintiff contends that the ALJ erred in his RFC [6] determination because he rejected Dr. Hudgens' findings and relied instead, upon the findings of consultative physicians Drs. Fontana and Shaikh. *See supra.* The ALJ's decision discounting the findings of Plaintiff's treating physician, Dr. Hudgens, is not supported by substantial evidence. Eleventh Circuit case law provides that controlling weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See, e.g., Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159–1160 (11th Cir.2004); *Phillips v. Barnhart*, 357 F.3d 1232, 1240–1241 (11th Cir.2004); *Lewis v. Callahan*, 125 F.3d 1436, 1439–1441 (11th Cir.1997); 20 C.F.R. § 404.1527(d)(2). "[G]ood cause exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1240–1241 (citing to *Lewis*, 125 F.3d at 1440); *Edwards v. Sullivan*, 937 F.2d 580 (11th Cir.1991) (holding that the ALJ properly discounted a treating physician's report where the physician was unsure of the accuracy of his findings and statements). When a treating physician's opinion does not warrant controlling weight, the ALJ must clearly articulate his reasons, which must also be legally correct and supported by substantial evidence in the record. *Crawford*, 363 F.3d at 1159–

1160; *Lamb v. Bowen*, 847 F.2d 698, 703–704 (11th Cir.1988).

In the case *sub judice*, the ALJ summarized the medical evidence and stated as follows with regard to Dr. Hudgens' findings:

> ... it is found that the totality of the evidence has not substantiated the claimant's allegations of totally disabling pain or functional limitations for any 12 consecutive months during the period under adjudication. In making this determination, the Administrative Law Judge is cognizant of the opinions offered at various times by the claimant's own treating physician, Dr. Hudgens, i.e., that the claimant has been totally unable to work since her fall in November 2002.... **However, for a variety of reasons ... that opinion has not been assigned determinative or controlling weight.**
>
> .... The Administrative Law Judge observes that, among other reasons discussed herein, consulting medical specialists of record have disagreed with Dr. Hudgens' opinion that the claimant has been unable to work. The undersigned has adopted the most stringent work limitations of these consulting physicians in determining the claimant's residual functional capacity.
>
> .... Dr. Hudgens opined in a Disability Report that the claimant did not have the ability to stand for more than 10–15 minutes.... However, this Administrative Law Judge must find such an **assessment** as being **inconsistent with Dr. Hudgens' own treatment records.** It is noted that despite Dr. Hudgens'

---

6. Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences. *Id.* In evaluating a claimant's residual functional capacity, the ALJ is obliged to consider all of the claimant's impairments, including subjective symptoms such as pain. *Id.*

observation that the claimant had notable creptiance and grinding on both knees, he had reported that at the December 4, 2002 office visit the claimant had had normal range of motion of both knees and no sign of any instability to the knees. Moreover, although Dr. Hudgens advised 2 weeks later that the claimant still had a "fair" amount of swelling, he conveyed that the claimant's pain appeared to be easing "a little".... As noted previously, he characterized the claimant's overall condition as being "about the same" in January 2003.

It is noted that although on January 23, 2003 Dr. Hudgens assessed the claimant as being "likely" incapacitated for further performance of duty, this assessment was made in connection with a disability statement provided to the Retirement Systems of Alabama.... There has been no evidence presented to show that Dr. Hudgens was aware of the criteria established by the Social Security Administration that must be met in order for an individual to be considered "disabled." **Moreover, it is possible that the doctor was referring solely to an inability to perform the claimant's past work, which is consistent with the conclusions reached in this decision.**

It is noted that Dr. Hudgens subsequently completed a physical capacities assessment two months later in which he opined that the claimant had not been capable of performing sustained work on a regular and continuing basis, i.e., 8 hours a day, 5 days a week, and would need a job that permitted shifting positions at will from sitting, standing, or walking, noting that the claimant had an "extreme" limitation in her ability to walk. He additionally prescribed the use of a cane for the claimant on April 3, 2003.... He advised in a June 2003 statement that the claimant had not achieved long term or significant relief

from any medications, other than occasional injections into the knees; and he opined that the claimant's condition had worsened since November 2002, characterizing the claimant as having "significant" grinding and crunching sounds within her knees. Dr. Hudgens further provided that the claimant would "most likely" be unable to be gainfully employed.

While Dr. Hudgens' opinion has been carefully considered, the Administrative Law Judge notes that whether or not an individual is disabled is an issue solely reserved to the Commissioner.... The Administrative Law Judge further notes that the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. **While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as is the current case.**

**Specifically, despite Dr. Hudgens' opinion that the claimant has been totally incapacitated to work, both consultants who examined the claimant at the hearing level, well into the time period during which Dr. Hudgens' termed the claimant's condition as having worsened, subsequently determined that the claimant remained capable of some type of gainful employment....**

\* \* \* \* \* \*

... While the June 2003 statement provided by Dr. Hudgens reflects that the claimant may eventually undergo knee replacement, it is noted that the **claimant testified that Dr. Hudgens had not set time for surgery because of her "young age" and because he "wanted to give [her] time to see if [she] would get better."**

Based on the foregoing, the Administrative Law Judge finds that the claimant has retained the residual functional capacity for a wide range of sedentary exertion, in function-by-function terms, namely with the ability to walk for 15 minutes to 1 hour at a time and 2–4 hours total, stand for 30 minutes to 1 hour at a time and 3–4 hours total, and sit for 1–4 hours at a time and for 6–8 hours total during an 8–hour workday, with the following additional nonexertional postural and environmental restrictions: occasional bending, squatting, crawling, climbing; and frequent reaching; total restriction from working around unprotected heights and exposure to fumes, noxious odors, dust, mists, gases of poor ventilation; "moderate" limitations on working around moving machinery; "mild" limitations on her ability to drive; and occasional exposure to extreme temperature changes, wetness/humidity, vibration, working in proximity to moving mechanical parts, and driving automotive equipment.

\*　　\*　　\*　　\*　　\*　　\*

(Tr. 29–30, 32) (emphasis in original) (citations omitted).

 Here, the undersigned's review of the record reveals that board certified orthopaedic specialist and surgeon, Dr. Hudgens, evaluated Plaintiff and her knees on numerous occasions from 2001–2004. *See supra.* During this time, he ordered MRI studies, performed outpatient diagnostic arthroscopic surgeries, sent her for physical therapy and rehabilitation, prescribed a cane for her to ambulate, performed corticosteroid and Synvisc injections, and prescribed a variety of medications. *Id.* Dr. Hudgens noted "significant grinding and crunching" of her knees; did not feel that her condition was likely to improve; expected that her knees would need to be completely replaced; found that she could not work in her condition; and noted that her pain was so severe that it would distract her from work-related tasks and that physical activity would cause her to stop working altogether. *Id.* While Dr. Hudgens noted in July–August 2002 that Plaintiff had experienced improvement in her condition during the 5 weeks of physical therapy following her knee surgery and even reported being fairly comfortable such that she could resume regular work activity with self-imposed restrictions, Plaintiff suffered a slip and fall at work in November 2002, and this dramatically changed her status, for the worse. *Id.* From December 2002 to April 2004, Dr. Hudgens' records reveal complaints of increasing knee pain; examination findings of crunching, grinding and swelling in her knees; continued use of a walking cane to ambulate; effusion; acute exacerbation of osteoarthritis; and significant and moderate to severe crepitus to such an extent that Dr. Hudgens prescribed different pain medications including Bextra, Darvocet, Glucosamine/Chondroitin, Lortab, Jointritis Cream and Arthritis Hot, and injected her knees with Depo–Medrol, Lidocaine, Marcaine and Synvisc on numerous occasions, with no long term relief. *Id.* Dr. Hudgens also had first-hand knowledge of the extent of Plaintiff's degenerative osteoarthritic changes in her knees, as he personally visualized them via diagnostic arthroscopy. *Id.* Based on his treatment of Plaintiff, Dr. Hudgens noted that her condition was worsening, concluded that she was unable to return to work, and opined that she would need a knee replacement.

*See supra.* He noted further, that the problems caused by the side effects of her various pain medications (drowsiness and nausea) would impair her ability to work. *Id.* In sum, Dr. Hudgens' treatment records and surgical history with Plaintiff—covering over three years and including clinical evidence from medically acceptable clinical and laboratory diagnostic techniques (approximately 24 evaluations, surgeries, MRI studies, etc.) clearly support his opinions regarding Plaintiff's prognosis and her functional limitations.

Moreover, while the two consultants who examined Plaintiff did not opine that she was unable to work, their examinations of Plaintiff confirmed many of the findings contained in Dr. Hudgens' treatment notes such as a poor heel to toe gait; a poor heel to toe gait; severe left knee creptius; moderate right knee creptius; significant popping with ambulation; a poor ability to squat; knee spurring; inability to stand on her heels and toes; an unstable gait; moderate to severe deficits with her knees and dorso-lumbar spine and a mild ROM deficit; and an inability to squat and touch her fingers to her toes. *See supra.* Dr. Shaikh also noted that Plaintiff continued to "suffer from knee pain despite arthroplastic intervention[,]" and may eventually require a total knee replacement. *Id.* Given that Dr. Hudgens had treated Plaintiff over a three year period and had utilized a variety of treatments to address her knee problems, he was clearly better able to provide a detailed, longitudinal picture of her medical impairments and functional limitations flowing therefrom than consultants who examined her on one occasion. 20 C.F.R. § 404.1527(d)(2). *See, e .g., Walker v. Bowen,* 826 F.2d 996, 1000–1001 (11th Cir.1987); *Hillsman v. Bowen,* 804 F.2d 1179, 1181 (11th Cir.1986); *Wilson v. Heckler,* 734 F.2d 513, 518 (11th Cir.1984); *Lamb,* 847 F.2d at 703.

It is also significant that while the ALJ found that there was no evidence that Dr. Hudgens was aware of the Social Security disability criteria—intimating that his findings were merely linked to Plaintiff's inability to perform her PRW—the ALJ simultaneously acknowledged that Dr. Hudgens had completed a physical capacities assessment which actually included the definition of sedentary work. (Tr. 30). In this assessment, a Medical Source Statement, Dr. Hudgens did not merely state that Plaintiff could not work, but rather, stated specifically that she was not capable of performing sustained sedentary work on a regular and continuing basis. *See supra.*

Additionally, the ALJ's suggestion that Dr. Hudgens' findings were based upon "sympathy" for Plaintiff and/or "insistent or demanding requests for supportive notes," finds no support in the record, and amounts to little more than pure conjecture and speculation. Further, the ALJ discounted Dr. Hudgens' opinion that Plaintiff's medications could be expected to limit her effectiveness due to such things as inattention and drowsiness based on his belief that if the medications had been causing such severe side effects, the doctor would have changed her medication or dosage. First of all, there is no evidence in the record which contradicts or calls into question Dr. Hudgens' opinion regarding the effects of Plaintiff's medication. In fact, Plaintiff testified that she went as long as she could without taking some of her pain medication because of the drowsiness they caused. *See supra.* Second, there is nothing in the record to suggest that drowsiness is not a side effect of the medications in issue. What the record does show, is that Dr. Hudgens utilized a variety of treatments—including surgery, physical therapy, injections and medications—in an effort to provide Plaintiff with relief from her knee pain. *See supra.*

For the ALJ to attempt to theorize on the actions Dr. Hudgens should have taken, in order to address the side effects of Plaintiff's medications and then to reject his opinion because he did not take such actions, is wholly improper, as it borders on assuming the role of the medical provider in this case. Accordingly, the undersigned finds that the ALJ's decision was not based on substantial evidence such that this case is due to be remanded for a proper weighing of Dr. Hudgens' findings and for a new RFC determination.

## V. *Conclusion*

For the reasons set forth, and upon consideration of the administrative record and memoranda of the parties, it is **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits, be **REVERSED** and **REMANDED** for further proceedings not inconsistent with this Order.

### *JUDGMENT*

In accordance with the Order entered on March 29, 2007, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits, be **REVERSED** and **REMANDED.**